**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 26 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENH CIRCUIT

HUNG THANH LE,

       Petitioner - Appellant,

v.

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

       Respondent - Appellee.

No. 00-6333

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. CIV-98-1381-L)**

---

Lanita Henricksen (Mark Henricksen, with her on the briefs), Henricksen &
Henricksen, Lawyers, Inc., El Reno, Oklahoma, for Petitioner-Appellant.

Robert L. Whittaker, Assistant Attorney General of Oklahoma (W.A. Drew
Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma
City, Oklahoma, for Respondent-Appellee.

---

Before **EBEL** , **HENRY** , and **BRISCOE** , Circuit Judges.

---

**PER CURIAM.**

# I. INTRODUCTION

Petitioner-Appellant Hung Thanh Le, a state prisoner in Oklahoma, filed a petition pursuant to 28 U.S.C. § 2254 seeking habeas corpus relief from his convictions for first-degree murder, robbery, and assault and resulting death sentence. In his petition, Mr. Le raised thirty-one grounds for relief. The district court denied him relief on each ground, and it also denied Mr. Le's request for a Certificate of Appealability ("COA"). After conducting a case management conference, this court granted a COA on three issues. On the basis of his COA, Mr. Le now appeals the denial of his § 2254 petition, arguing that (1) he was deprived of a fair trial because of the prosecutor's improper remarks; (2) he was denied effective assistance of counsel at trial; and (3) he should have been granted an evidentiary hearing by the district court in relation to these first two issues. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, and we affirm the district court's denial of habeas corpus relief on all three grounds.

# II. BACKGROUND

A. Factual Background

This case concerns the tragic events of November 12, 1992. On that day, Hai Hong Nguyen, his wife Thuy Tiffany Nguyen, and Mr. Le became involved in an altercation that led to the death of Mr. Nguyen, to serious physical injury to

Mrs. Nguyen, and to the conviction of Mr. Le for assault and battery, robbery, and first-degree murder. To understand the events of that day, it is necessary to recount the history between Mr. Le and the Nguyens.

Mr. Le, a Vietnamese refugee, met Mr. Nguyen in a refugee camp in Thailand in the mid-1980s. They became friends, and both later immigrated to the United States. Mr. Nguyen settled in Oklahoma City, where he and his wife owned and operated a beauty salon. Mr. Le settled in Cleveland, Ohio, where he worked as a machinist. According to Mr. Le, he and Mr. Nguyen had planned to go into business together by opening a machine shop in Oklahoma City.

On July 4, 1992, Mr. Le flew to Oklahoma City, visited with Mr. Nguyen, and met Mrs. Nguyen for the first time. Mr. Le alleges that at this time he gave the Nguyens $10,000.00 as initial capital for the machine shop. By September of 1992, however, Mr. Le's family had arrived in the United States. Mr. Le asserts that because of his family's arrival, he wanted to reclaim the $10,000.00.

Whatever the purpose for his visit, Mr. Le returned to Oklahoma City again in November 1992. During the week of November 2, 1992, Mr. Le briefly stopped by the Nguyens' house in the early morning and told them that he was returning home to Cleveland after having secured a job in Texas. On November 9, 1992, Mr. Le again appeared at the Nguyens' house, and they offered him a place to stay. Mr. Le, after claiming to have lost his wallet, went shopping with

the Nguyens on November 10. Mrs. Nguyen testified that Mr. Nguyen gave Mr. Le $200.00 on that occasion. On November 11, Mr. Le went to the salon with the Nguyens, borrowed their car, returned to their home, removed their home stereo without their knowledge, and then mailed the stereo to himself in Ohio. Mr. Le returned the car that afternoon so that Mrs. Nguyen could pick up her daughter, Carolyn, after school. When the Nguyens returned home that evening accompanied by Mr. Le, they noticed the missing stereo. A search of the house revealed no other missing items and no signs of a forcible entry. Mr. Le told the Nguyens that he did not know what happened to the stereo and that he had an expensive personal bag that was also missing.

Mrs. Nguyen testified that the next morning—November 12—she was called from her bed by her husband's words, "Honey, Hung kill me." Tr. vol. II, at 336. She ran into the living room of their house and found her husband covered in blood. Mrs. Nguyen dialed 911 and requested help. She next saw her husband try to pick up an 18-inch long metal bar from a barbell set that had apparently been used by Mr. Le to hit Mr. Nguyen. Mrs. Nguyen stopped him, telling her husband that she had called the police. At this point Mr. Le returned to the living room from the kitchen, brandishing a 13-inch long knife and a 7-inch long meat cleaver. According to Mrs. Nguyen, Mr. Le was visibly upset and angry, and she asked him to stop his attack. Mr. Le then attempted to corner Mr.

-4-

Nguyen with the weapons. When Mr. Le tried to reach for Mr. Nguyen, a struggle ensued into which Mrs. Nguyen interceded, receiving knife wounds to her head and hands.

Mrs. Nguyen then retreated to the front door, but she was unable to open it. As Mr. Le pulled Mr. Nguyen towards the front door, Mrs. Nguyen sat down next to the television, shielding her injuries, and pleaded with Mr. Le to stop his attack. Mrs. Nguyen then watched Mr. Le stab her husband in the chest. According to Mrs. Nguyen, when her husband fell down onto the coffee table and couch, Mr. Le proceeded to hack at the back of Mr. Nguyen's neck with the meat cleaver.

Mrs. Nguyen's account of the events, which was uncontested at trial, is that Mr. Le responded to her pleas by telling her that he would kill her, too, for calling the police. At some point, Mr. Nguyen apparently asked Mr. Le why he was attacking them, and Mr. Le responded that he had been hired by someone to kill the Nguyens for $20,000.00. Mr. Le apparently then told Mrs. Nguyen to write him a check for this amount, but she responded that they did not have that amount of money. As her husband lost consciousness, Mrs. Nguyen ran back to the door and made it outside, finding an ambulance on the street.

The two paramedics who had arrived on the scene were waiting for the police before entering the Nguyens' house. When Mrs. Nguyen exited the house,

they treated her wounds. While the paramedics treated Mrs. Nguyen, Mr. Le collected Mr. Nguyen's wallet, the Nguyens' keys, and a suit. Mr. Le then left the house and drove away in the Nguyens' car. One paramedic testified that he saw Mr. Le surveying the scene nonchalantly while driving away.

After learning that there was nobody else in the house, one of the paramedics entered, accompanied by two police officers who had just arrived. The paramedic testified that he saw Mr. Nguyen writhing on the ground, stating, "[H]elp me, help me, I'm dying, I'm dying." Tr. vol. II, at 320. Mr. Nguyen also asked the paramedic to help his wife, telling the paramedic that she had been hurt, too. Mr. Nguyen had multiple stab wounds to his chest, neck, head, abdomen, and arms, and he subsequently went in to hypovolemic shock and cardiac arrest before arriving at the hospital. At the hospital, Mr. Nguyen went into full cardiac arrest and died.

After leaving the Nguyens' house, Mr. Le began driving towards Dallas, stopped at a ditch to wash the blood off his body, and then returned to Oklahoma City. At some point after the events of that morning, Mr. Le went to the Nguyens' bank and, assuming Mr. Nguyen's identity, used the Nguyens' safety deposit box key to open their safety deposit box. Mr. Le removed $36,000.00 in cash and two diamond rings, leaving the box empty. Mr. Le left the Nguyens' car at the bank with blood and his fingerprints on it. That day, Mr. Le also bought

expensive new clothes and paid cash to a downtown travel agent for a one-way first class airline ticket to Cleveland. The ticket was issued under the name Paul Koring.

The following day—Friday, November 13, 1992—after placing bets at Remington Park, an equine racetrack in Oklahoma City, Mr. Le was apprehended at the Will Rogers World Airport by a police officer who recognized his description. Mr. Le claimed his name was Paul Koring and that his identification had been stolen. When Mr. Le failed to produce identification, the officer took him into custody and searched him for weapons. During the search, the police officer found Mr. Nguyen's wallet and a briefcase containing the Nguyens' safety deposit box key, the Nguyens' car keys, and $34,966.37 in cash.

After his arrest, Mr. Le was booked at the police station, and his interrogation was videotaped. During the interrogation, he waived his <u>Miranda</u> rights and recounted his version of the events. Mr. Le admitted coming to Oklahoma City with the intent of robbing the Nguyens. He admitted to knowing beforehand about the safety deposit box and the address of the bank, but he said he never intended to kill Mr. Nguyen. He admitted having taken the Nguyens' stereo and mailing it to Ohio, and he said that Mr. Nguyen had confronted him about the theft the morning of the murder. He told the officers that the morning of November 12—even before being confronted by Mr. Nguyen about the

-7-

stereo—he intended to rob Mr. Nguyen by knocking him out with the metal pipe from the weightlifting set.

Mr. Le admitted striking Mr. Nguyen and noted that Mr. Nguyen remained conscious after receiving the blow. Mr. Le claimed that Mr. Nguyen then threatened to kill Mr. Le if he did not stop, at which point Mr. Le said he ran into the kitchen and grabbed only one knife. Mr. Le claimed that Mr. Nguyen hit him on the forearm, to which Mr. Le responded by stabbing Mr. Nguyen five times. Mr. Le claimed that at this point, Mr. Nguyen collapsed on the coffee table. Mr. Le admitted to having told Mrs. Nguyen that he was hired to kill her and hitting her as a warning. He then confirmed the rest of the events after the homicide. Mr. Le did not mention the business plans he allegedly had with the Nguyens, although he suggested he knew the Nguyens had at least $10,000.00 in their safety deposit box.

B. Procedural Background

The State of Oklahoma charged Mr. Le with five criminal counts, including: first-degree murder with malice aforethought; robbery with a dangerous weapon; assault and battery with intent to kill; grand larceny; and

larceny of a motor vehicle. [1] At the subsequent jury trial in September of 1995, Mr. Le was represented by counsel, and the state sought the death penalty. The jury found Mr. Le guilty on all five counts. During the sentencing stage of the trial, the state argued that three aggravating circumstances justified the death sentence: (1) the knowing creation of a great risk of death to multiple persons; (2) the commission of a murder that was especially heinous, atrocious, or cruel; and (3) the commission of a murder for the purpose of avoiding or preventing a lawful arrest or prosecution. The jury found the first two aggravating circumstances to have been present and imposed a sentence of death in relation to the first-degree murder conviction. The jury also imposed sentences of ninety-nine and twenty years on Mr. Le's convictions for robbery with a dangerous weapon and assault and battery with the intent to kill, respectively. The Oklahoma Court of Criminal Appeals later dismissed Mr. Le's convictions on grand larceny and larceny of a motor vehicle, reasoning that the convictions violated the prohibition against multiple punishment contained in Okla. Stat. tit. 21, § 11. See Le v. Oklahoma, 947 P.2d 535, 548-49 (Okla. Crim. App. 1997) [hereinafter " Le I"]. However, the Court of Criminal Appeals affirmed the remaining convictions on direct appeal. See id. at 558.

---

[1] In violation of Okla. Stat. tit. 21, §§ 701.7(A), 801, 652, 1704, and 1720 (1991 and 1992 Supp.), respectively .

After the conclusion of his direct appeal, Mr. Le filed for Oklahoma post-conviction relief, asserting thirteen grounds for relief, including a request for an evidentiary hearing. Mr. Le's request for relief and for a hearing was denied. See Le v. Oklahoma, 953 P.2d 52 (Okla. Crim. App. 1998) [hereinafter "Le II"].

On February 1, 1999, Mr. Le filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of Oklahoma, raising thirty-one grounds for relief. The district court denied relief on each ground. Mr. Le then requested a COA on a number of grounds, but the district court denied a COA on each.

We subsequently granted a COA on the following issues:

a) Whether the United States District Court should have granted appellant an evidentiary hearing;
b) Whether the appellant was deprived of a fair trial because of the improper remarks of the prosecutor;
c) Whether appellant was denied effective assistance of counsel as set forth in Ground XI of his petition.

Case Management Order (Nov. 13, 2000). It is on the basis of this certificate that Mr. Le's appeal reaches this court.

### III. STANDARD OF REVIEW

Mr. Le filed his habeas petition on February 1, 1999, and our review is therefore governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). See Paxton v. Ward,

-10-

199 F.3d 1197, 1204 (10th Cir. 1999) (stating that AEDPA applies to habeas corpus petitions filed after April 24, 1996, regardless of the date of the criminal trial forming the basis of the conviction). The nature of our review of a federal district court's ruling on a request for habeas corpus relief depends on whether the claim was decided on the merits in state court. When the state courts adjudicated the merits of a particular claim, a petitioner is not entitled to relief unless the state court ruling on that matter "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

Whether the Oklahoma court's outcome is either "contrary to" or an "unreasonable application of" clearly established Federal law turns on the analysis that we adopted in Thomas v. Gibson, 218 F.3d 1213, 1219-20 (10th Cir. 2000):

> As for § 2254(d)(1)'s "contrary to" clause, Justice O'Connor [in Terry Williams v. Taylor] noted that a state-court decision would be contrary to the [Supreme] Court's clearly established precedent in two circumstances: (1) "the state court applies a rule that contradicts the governing law set forth in [the Court's] cases"; or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from" the result reached by the Supreme Court. Under the "unreasonable application" clause, on the other hand, a federal habeas court may grant the writ only if "the state court identifies the correct

-11-

governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." To be clear, "[u]nder § 2254(d)(1)'s 'unreasonable application' clause . . . , a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

Id. at 1220 (citations omitted, alterations added and in original) (quoting Terry Williams v. Taylor, 529 U.S. 362, 405-06, 413 (2000) (opinion of O'Connor, J., speaking for the court on this issue)). Where AEDPA's deferential standard of review applies, the factual issues decided by the Oklahoma court are presumed to be correct, and Mr. Le bears the burden of rebutting this presumption by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

When the state courts have not addressed the merits of a specific constitutional claim, however, there is no adjudication of that claim and hence we review the federal district court's legal determinations *de novo* and its factual findings for clear error. See Romano v. Gibson, 278 F.3d 1145, 1150 (10th Cir. 2002).[2]

---

[2] If, in the context of a *summary disposition*, a state court gives any indication that it addressed all of a petitioner's federal constitutional claims—even if the state court says nothing about the specifics of the petitioner's arguments, fails to reference federal case law supporting the decision, and remains silent as to the reasoning forming the basis of its resolution—this court applies AEDPA's deferential standard of review. See Aycox v. Lytle, 196 F.3d 1174, 1177 (10th Cir. 1999) (applying the 28 U.S.C. § 2254(d) standard of review based on a state court's summary disposition that, "as a matter of law, [the]

(continued...)

-12-

## IV. ANALYSIS

We analyze separately each of the three issues on which we granted a COA.

We begin with Mr. Le's request for an evidentiary hearing, continue with Mr.

Le's assertion of prosecutorial misconduct, and conclude with the claim of

ineffective assistance of trial counsel.

### A. Request For An Evidentiary Hearing

Mr. Le requests an evidentiary hearing with respect to his allegations of

---

[2](...continued)
Petitioner [was] not entitled to relief"). This is so because each "claim . . . was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), even where the state court eschews the "far preferable" treatment of explaining the underlying reasoning of the decision. Aycox, 196 F.3d at 1178 n.3.

However, when a state court fails to address a petitioner's claim or argument, we are left without a state court adjudication of that claim. In that instance, there is no adjudication on the particular claim to which deference under § 2254(d) attaches, and hence we review that particular claim *de novo*. See Duckett v. Mullin, 306 F.3d 982, 990 n.1 (10th Cir. 2002) (concluding that, when the state court addressed all but one of over thirty claims, the claim that the state court did not address should be reviewed de novo); Wallace v. Ward, 191 F.3d 1235, 1241 (10th Cir. 1999); Romano v. Gibson, 239 F.3d 1156, 1166 (10th Cir. 2001) (reviewing *de novo* a federal claim only addressed by the Oklahoma Court of Criminal Appeals on state grounds).

This conclusion follows from the language of § 2254. Section 2254(b) focuses on whether the "claim" was adjudicated, not whether the "case" was adjudicated. Furthermore, the statute's requirement of deference applies only when "the adjudication of a claim . . . resulted in a decision." If a claim was never considered, it cannot result in a decision. Cf. Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 500-06 (2001) (concluding that the meaning of the phrase "adjudication upon the merits," as used in Fed.R.Civ.P. 41(b), depends upon the context in which the phrase appears).

prosecutorial misconduct and ineffective assistance of trial counsel in order to explore the ways in which Mr. Le's lack of fluency in English and his lack of understanding of his rights may have affected the trial's outcome. Specifically, Mr. Le asserts that such a hearing would show that he did not understand the waiver of his <u>Miranda</u> rights at his post-arrest interview, that his trial counsel was biased against him, and that he did not understand his rights or the law. Mr. Le argues that evidence in these areas will support his claim that the prosecutor engaged in misconduct and that he received ineffective assistance of counsel.

In order to determine whether Mr. Le is entitled to receive an evidentiary hearing, we assess his request under 28 U.S.C. § 2254(e)(2)'s stringent requirements:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>    (A) the claim relies on—
>         (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>         (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Under this provision, a threshold question is whether Mr. Le "failed to develop the factual basis of [the] claim in State court proceedings," for if he so failed,

-14-

then the requirements of § 2254(e)(2) will be difficult, if not impossible, for Mr. Le to satisfy. Absent such a failure to develop the factual basis of the claim, Mr. Le is entitled to an evidentiary hearing if his allegations, if true and not contravened by the record, would entitle him to habeas relief. See Mayes v. Gibson, 210 F.3d 1284, 1287 (10th Cir. 2000).

"[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Michael Wayne Williams v. Taylor, 529 U.S. 420, 432 (2000). Although Mr. Le made limited requests for an evidentiary hearing during his direct and post-conviction state appeals, he did not specifically request a hearing with regard to his claims of prosecutorial misconduct or ineffective assistance of counsel. Due to this lack of diligence, § 2254(e)(2) dictates that this court not grant Mr. Le's request for a hearing unless he first shows that his claims of prosecutorial misconduct and ineffective assistance of trial counsel involve either a new rule of constitutional law that was previously unavailable or that the factual predicate to the claim could not have been previously discovered through due diligence. Since Mr. Le advances no arguments suggesting that either claim relies on a new rule of constitutional law, his only way of satisfying the requirements of § 2254(e)(2) is to show that the factual predicate to his claim could not have been previously discovered through due diligence. In relation to

-15-

the claim of prosecutorial misconduct, Mr. Le alleges no such facts, and thus the district court properly denied Mr. Le's request for a hearing on this topic.

Regarding his claim of ineffective assistance of trial counsel, Mr. Le points to a new affidavit alleging that his trial attorney was biased against Asians. While this is a new affidavit, there is no suggestion that Mr. Le could not previously have discovered this information. Further, in order to be entitled to an evidentiary hearing, Mr. Le must show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B). Here, there is no evidence of constitutional error based on the alleged bias of his trial counsel. Moreover, the evidence against Mr. Le at trial was strong, and there is no evidence—and certainly not clear and convincing evidence—that any bias by his trial counsel actually affected counsel's performance. Therefore, his request for an evidentiary hearing on this claim also must be denied.

B. Prosecutorial Misconduct

There were two prosecutors arguing on behalf of the state during Mr. Le's criminal trial: Oklahoma County District Attorney Robert H. Macy and an Assistant District Attorney. Mr Lee points to five different types of comments

made by the prosecutors that, according to Mr. Le, warrant habeas corpus relief. Mr. Le asserts that the comments in question impermissibly: (1) asked for sympathy for the victims; (2) misstated the law; (3) argued facts not in evidence; (4) ridiculed Mr. Le in front of the jury; and (5) encouraged the jury to think it had a moral obligation to impose the death sentence. Mr. Le argues that the prosecutors' comments in each of these areas separately constitute a violation of his Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment and to receive due process. Even if each of these comments is found to be harmless error, Mr. Le states that, examined cumulatively, they warrant relief. Finally, Mr. Le asserts that the "footnote nine exception" from Brecht v. Abrahamson, 507 U.S. 619, 638 n.9 (1993), permits habeas corpus relief absent a showing of prejudice. We now address each of Mr. Le's arguments in turn.

1. Standard of Review For Prosecutorial Misconduct Under AEDPA

In cases where the state court adjudicated a prosecutorial misconduct claim on the merits, we apply AEDPA's deferential standard of review. See Walker v. Gibson, 228 F.3d 1217, 1241 (10th Cir. 2000), *abrogated on other grounds by* Neill v. Gibson, 278 F.3d 1044, 1057 (10th Cir. 2001). As already noted, however, where a federal constitutional argument was raised on direct appeal but not addressed by the state court in any manner, we review that argument *de novo*.

See Romano, 278 F.3d at 1150.

Generally, a prosecutor's improper remarks require reversal of a state conviction only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 645 (1974). Alternatively, if the alleged prosecutorial misconduct denied the petitioner a specific constitutional right (rather than the general due process right to a fair trial), a valid habeas corpus claim may be established without proof that the entire trial was rendered fundamentally unfair. See Paxton, 199 F.3d at 1217.

Inquiry into fundamental fairness requires examination of the entire proceedings, including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase. See Donnelly, 416 U.S. at 643; Fero v. Kerby, 39 F.3d 1462, 1474 (10th Cir. 1994). Any cautionary steps—such as instructions to the jury—offered by the court to counteract improper remarks may also be considered. See Darden v. Wainwright, 477 U.S. 168, 182 (1986). Counsel's failure to object to the comments, while not dispositive, is also relevant to a fundamental fairness assessment. See Trice v. Ward, 196 F.3d 1151, 1167 (10th Cir. 1999). "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181 (quotation marks omitted). Ultimately,

-18-

this court considers the jury's ability to judge the evidence fairly in light of the prosecutor's conduct. See Tillman v. Cook, 215 F.3d 1116, 1129 (10th Cir. 2000).

Here, Mr. Le invokes the general, due process analysis articulated by Donnelly v. DeChristoforo and Darden v. Wainwright, and hence we will examine whether the prosecutor's comments rendered the trial fundamentally unfair.[3]

---

[3] During the course of his prosecutorial misconduct arguments, Mr. Le suggests—citing Woodson v. North Carolina, 428 U.S. 280 (1976), and Tuilaepa v. California, 512 U.S. 967 (1994)—that his Eighth Amendment rights, in addition to his due process rights under the Fourteenth Amendment, were violated. See Aplt's Br. at 19, 25. Hence, it seems as if Mr. Le might be attempting to argue that some specific constitutional right was violated so as invoke the less-stringent test articulated by Paxton.

It is true that both Woodson and Tuilaepa impose requirements on the states under the Eighth Amendment, as applied to the states by the Fourteenth Amendment, in capital cases. Of particular importance is the principle that the imposition of a death sentence by a jury must be "an individualized determination on the basis of the character of the individual and the circumstances of the crime", see Tuilaepa, 512 U.S. at 972 (quoting Zant v. Stephens, 462 U.S. 862, 879 (1983)), a requirement that is met "when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." See Tuilaepa, 512 U.S. at 972. Also relevant is the general rule under the Eighth Amendment that capital cases require a heightened degree of reliability. See Caldwell v. Mississippi, 472 U.S. 320, 328-30, 340 (1985). Presumably, prosecutorial misconduct could have an effect on a jury that would violate a defendant's specific rights under the Eighth Amendment as articulated by Woodson, Tuilaepa, and Caldwell.

Mr. Le cites no cases and makes no argument explaining how any of the alleged prosecutorial misconduct denied him a specific constitutional right as required for application of the analysis articulated in Paxton. Therefore, while we remain cognizant of Mr. Le's general Eighth Amendment concerns during our analysis of the fundamental fairness of the trial, we find no assertion of the

(continued...)

-19-

2. Prosecutorial Remarks Invoking Sympathy For the Victims

The prosecutors made a number of remarks during both stages of the trial

that appear to have been meant to elicit sympathy for the victims. These remarks

include comments contrasting the state of the Nguyen family before and after Mr.

Nguyen's death,[4] comments repeating Mr. Nguyen's dying words,[5] comments

suggesting the victims—and not Mr. Le—deserve the jury's sympathy,[6] and

comments highlighting the impact on Mrs. Nguyen and her daughter.[7] In

_____

[3](...continued)
deprivation of a specific constitutional right so as to warrant Paxton's less-stringent analytical requirements.

[4] "November the 11th, 1992, Hai Nguyen was living with his wife and his daughter. . . . He and his wife were saving their money as quickly as they could, putting it in the bank. Everything was going well. His future really looked bright. On November 13th of 1992, Hai Nguyen's lifeless body was laying on a cold, cold slab in a morgue. He no longer had any future and the future of this young lady and her daughter had been destroyed." Tr. vol. IV, at 592-93 (guilt phase).

[5] "Hai [Nguyen] was talking to [the medic]. He knows he's dying. He says [']I'm dying, what about my wife?['] That's his dying concern, his dying wife." Tr. vol. IV, at 699 (sentencing phase).

[6] "[Y]ou can sentence [Mr. Le] to life or life without parole. . . . He'll be well-cared for, well-fed. What about Hai [Nguyen]? See, you can consider the victim in this case. You don't have to feel sorry for Hung Le . . ." Tr. vol. IV, at 707-08 (sentencing phase).

[7] "So when counsel pleads with you as they will you think about [Mrs. Nguyen's] pleas and you think about [their daughter,] Carolyn. And you think about that little six-year-old girl that day who was in school who had to go home to a scene that's as macabre as any imaginable in any movie you might see. And

(continued...)

-20-

addition, Mr. Macy contrasted Mr. Nguyen's death with the life Mr. Le would live

if given anything other than a death sentence:

> Next year [Mr. Le] will be a year older and Hai Nguyen will be 34 years old from now until eternity. He will always be 34.

Tr. vol. IV, at 729-30. And:

> Ladies and gentlemen, justice needs to be done in this case. Defense counsel asked you to sentence [sic] a punishment of life imprisonment or life without parole, but do you really think that justice would be done if this man goes to prison, gets three meals a day and a clean bed every night and regular visits from his family while Hai Nguyen lays cold in his grave[?]

Id. at 743.

It is a hallmark of a fair and civilized justice system that verdicts be based

on reason, not emotion, revenge, or even sympathy. Arguments that improperly

encourage the jury to impose a sentence of death based on considerations of

sympathy for the victims may constitute due process error. See Moore v. Gibson,

195 F.3d 1152, 1172 (10th Cir. 1999) ("This court does not condone prosecutorial

remarks encouraging the jury to allow sympathy [for the victim] to influence its

decision."); cf. Payne v. Tennessee, 501 U.S. 808, 831 (1991) ("If, in a particular

case, a witness' [victim impact] testimony . . . so infects the sentencing

---

[7](...continued)
what about that girl? You can think about that back there as counsel pleads with you. You think about that little girl who's six years old who's always scared who doesn't smile who wouldn't sleep for the longest period of time." Tr. vol. IV, at 709-10 (sentencing phase).

proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.") (O'Connor, J., concurring). "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, *based on reason rather than caprice or emotion*." Gardner v. Florida, 430 U.S. 349, 358 (1977) (emphasis added).

Certainly, states may choose to allow victim impact testimony, see Payne, 501 U.S. at 827, and Oklahoma allows testimony about a crime's impact on the victims so long as the testimony does not violate due process. See Cargle v. Oklahoma, 909 P.2d 806, 826 (Okla. Crim. App. 1995). To the extent that Mr. Macy's comments attempted to convey to the jury the impact of the murder on the victim's family, such comments comport with due process absent a showing that they rendered the trial fundamentally unfair. See Payne, 501 U.S. at 827.

On the other hand, some of these comments, especially in conjunction with those discussed below, would not assist a jury in rendering a just verdict based on reason. Mr. Le argues that all murder trials—by definition—have a victim who will forever remain dead and that it is error for a prosecutor to overly-assert this fact to the jury. In addressing Mr. Le's argument on this point, the Court of Criminal Appeals admonished:

> The State should not encourage the jury to impose the death penalty out of sympathy for the victims. This Court has specifically condemned

-22-

many of the comments made in [the] second stage [of this case and in another case involving the same prosecutor], stating "[t]here is no reason for them and counsel knows better and does not need to go so far in the future." Duckett v. State, 919 P.2d 7, 19 ([Okla. Crim. App.] 1995). Le persuasively argues that the State's contention—it is unfair for Le to live since Nguyen is dead—creates a *super-aggravator* applicable in every death case. No amount of mitigating evidence can counter this argument, and if the jury agrees they may not even consider mitigating evidence.

Le I, 947 P.2d at 554-55 (citations omitted and emphasis added). The Court of Criminal Appeals stated that these "arguments were certainly error[.]" Id. at 555.

While testimony by witnesses about the impact on victims may be proper, a prosecutor should not seek to inflame the jury through needless repetition of testimony already presented. And as noted by the Oklahoma court in Le I, over-emphasizing the permanency of the victim's death may constitute error because all homicides, by definition, have a victim who will forever remain dead. Repeated attempts by the prosecution to contrast the living defendant with the dead victim might encourage the jury not to consider mitigating evidence, in violation of the Eighth Amendment. Cf. Tuilaepa v. California, 512 U.S. 967, 972 (1994) (noting the requirement that the jury consider mitigating evidence before imposing a death sentence).

Nevertheless, the Court of Criminal Appeals determined that the error was harmless in light of the overall record. See Le I, 947 P.2d at 555. That court noted defense counsel's failure to object to most of the prosecutors' comments at

-23-

trial and referenced both the overall circumstances of the case and the trial as a whole. See id. at 556. Hence, it appears that the Court of Criminal Appeals considered the correct factors in reaching its determination. See Trice, 196 F.3d at 1167 (discussing the proper analysis in determining whether a trial was fundamentally unfair). Moreover, Mr. Le admits that his attorney failed to object to many of the prosecutor's comments at issue.

Of much greater significance in the present context is the overwhelming evidence of Mr. Le's guilt and evidence of the aggravating factors supporting the death sentence. Further, the trial court instructed the jury that, as alternatives to the death penalty, it could impose a sentence of life or life without parole. Mr. Le's counsel reminded the jury of that fact in his closing argument, and he added that the prosecutor does not make the law. These instructions and arguments effectively countered Mr. Macy's emphasis on what the Court of Criminal Appeals called the "super-aggravator." See Le I, 947 P.2d at 554-55. Since Oklahoma allows victim impact testimony so long as it does not violate due process, and since the Court of Criminal Appeals applied the appropriate federal law in determining that the prosecutors' comments did not make the trial fundamentally unfair, we cannot conclude that court's judgment was unreasonable. See 28 U.S.C. § 2254(d)(1). Therefore, Mr. Le is not entitled to relief on this basis.

3. Prosecutorial Misstatements of the Law

Mr. Le next complains of Mr. Macy's alleged misstatement of the importance of mitigating character evidence to the jury's decision regarding the imposition of the death penalty. Mr. Le presented twenty-four different kinds of mitigating character evidence during the sentencing phase. See O.R. vol. II, at 271-72 (Sentencing Stage Jury Instruction No. 9, listing all twenty-four mitigating factors). It is well-settled that a defendant has the right to present mitigating evidence during the capital sentencing phase of a trial and that the jury must consider such evidence before imposing the death penalty. See Eddings v. Oklahoma, 455 U.S. 104, 113-14 (1982).

Nevertheless, during closing arguments the following exchange took place:

> Mr. Macy: We have a whole list of things that have been submitted as mitigating circumstances. *The Court instructs you that mitigating circumstances are those which in fairness and mercy—get this—may be considered as extenuating or reducing the moral culpability or blame. It doesn't say anything about whether you've been a good guy in the past or anything like that.* Do these circumstances extenuate or reduce the degree of moral culpability of responsibility for what he did? It's up to you to decide what are mitigating circumstances.
>
> [The defense talks] about [Mr. Le] being a hard worker, a machinist, inventions, a good teacher, teaching English to Vietnamese people, good to family. Does that in any way officiate (sic) or mitigate or relieve or make any less horrible what he did to Hai and Tiffany? I submit to you they do not. He's good to his family. He's got five things on here about his family. Well, nearly everybody is good to their family. Does it make it all right to go out and murder? Does it make you less

-25-

guilty when you go out and commit this kind of a crime?

Mr. Box[, Mr. Le's counsel]: Objection, your Honor.

Mr. Macy: Next, he's a devout Catholic and he mentions his age. Let me tell you something folks. Next year this man will be a year older and Hai Nguyen will be 34 years old from now until eternity. He will always be 34.

I don't want to go run through all of these. I submit to you, ladies and gentlemen, there is nothing in here, nothing in that list in any way mitigates or officiates (sic) or alleviates or makes any less horrible what this man did to Hai and Tiffany on November the 12th of 1992.

Tr. vol. IV, at 728-30 (emphasis added).

Mr. Le contends that these remarks, especially the emphasized portion, were improper as suggesting that the jury should not consider mitigating evidence. The Court of Criminal Appeals concluded that Mr. Macy's comments were both irrelevant and improper:

The prosecutor's argument was certainly irrelevant. The question is not whether evidence in mitigation makes the defendant any less guilty, or the crime any less horrible, but whether it provides a reason why, despite those things, the defendant should not die. The argument also appears to be improper as purely personal opinion. However, the argument did not clearly tell the jurors they could not consider Le's evidence in mitigation. Le has not shown it resulted in a verdict which was not a reasoned moral response.

Le I, 947 P.2d at 555. In making this determination, the Court of Criminal Appeals was clearly applying federal law, and thus we review under AEDPA's deferential standard.

We agree with the Court of Criminal Appeals that Mr. Macy's comments were both irrelevant to the case against Mr. Le and improper as personal opinion. Further, the words of Justice Sutherland, speaking for the Supreme Court nearly seventy years ago, inform our analysis on this point:

> The [prosecuting attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, [the prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, *while he may strike hard blows, he is not at liberty to strike foul ones.* It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. *Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.*

Berger v. United States, 295 U.S. 78, 88 (1935) (emphasis added).

Like the court in Berger, we are especially aware of the imprimatur of legitimacy that a prosecutor's comments may have in the eyes of the jury. In light of the jury's confidence that prosecutorial obligations to refrain from improper tactics will be fairly and faithfully observed, two questions arise in this case. First, did the prosecutor's comments, especially taking into account the apparent disdain for the instructions he communicated with his "get this" preface,

-27-

constitute error? And if so, did such error render Mr. Le's trial fundamentally unfair?

There is little question that Mr. Macy's comments on this point were, as the Court of Criminal Appeals noted, improper and irrelevant. It is difficult to tell from the record whether the comments were intended to encourage the jury to ignore the court's instructions regarding mitigating character evidence or simply to insert his opinion as to the evidence provided by defense counsel. Through his comments, Mr. Macy may have implied that the jury had the ability to ignore the legal requirement that it must consider mitigating evidence. Moreover, Mr. Le's counsel objected to Mr. Macy's comments, and the trial court, unfortunately, failed to rule on the objection.

Nevertheless, a review of the record indicated that the jury was appropriately informed by the jury instructions and by closing arguments that it had to consider mitigating evidence before deciding to impose a death sentence.[8] In particular, during the guilt phase of the trial, the court informed the jury that

---

[8] Generally, prosecutorial misstatements about the law should be addressed by the court through curative instructions or through other means of addressing the jury. Cf. Hooks v. Oklahoma, 19 P.3d 294, 312 (Okla. Crim. App. 2001) ("A trial court has a duty of special care to evaluate jurors' understanding of the law and clear away any explicit difficulties."). We do not intend our general discussion of the jury instructions to suggest that a trial court is not obligated to correct the misstatements made by a prosecutor, especially when such instructions are requested by a defendant.

"[t]he [jury] instructions contain all rules of the law that are to be applied by you in this case, and all the rules of law by which you are to weigh the evidence and determine the facts in issue in deciding this case and in reaching a verdict." O.R. vol. II, at 218 (Instruction No. 1). The same instruction was given to the jury during the sentencing phase. See id. at 263 (Sentencing Phase Instructions). Thus, the trial court attempted to make clear that the jury was to consider no law except that contained in the jury instructions, implicitly providing the jury with guidance to ignore Mr. Macy's improper suggestion on mitigating evidence. Additionally, statements made by Mr. Le's counsel at the closing arguments of the second stage highlighted the importance to the jury of focusing on the instructions given.[9]

Mr. Le's counsel also suggested to the jury during his closing argument that the prosecution may have misstated the law. At this point, Mr. Le's counsel told the jury that even if it found an aggravating circumstance, it need not impose a death sentence. Tr. vol. IV, at 714. Finally, Mr. Le's attorney reminded the jurors that they were required by law to consider mitigating evidence before imposing a death sentence and that it is not the prosecution that makes the law.[10]

---

[9] "The Court has instructed you in the instructions and, again, I implore you to look at the instructions." Tr. vol. IV, at 713.

[10] Mr. Le's attorney argued:

(continued...)

-29-

Accordingly, in light of the overwhelming evidence of Mr. Le's guilt and evidence of the presence of aggravating factors, because both the jury instructions and the defense counsel's argument correctly stated the law, and because Mr. Macy never explicitly and clearly misstated the law, we cannot conclude that the Court of Criminal Appeals unreasonably applied federal law regarding Mr. Le's claim that his trial was rendered fundamentally unfair. Cf. Mahorney v. Wallman, 917 F.2d 469, 473-74 (10th Cir. 1990) (finding reversible error based on prosecutorial misconduct where defense counsel vigorously objected to the misstatements of the law, the legal misstatements were clear, and the evidence against the defendants was not overwhelming). Mr. Le is not entitled to relief on this argument.

---

[10](...continued)
You're allowed to look at these things which we presented . . . that mitigate[,] and keep in mind the state tried to use the word ["]excuse["] a while ago[,] and I will implore you that I no way ever am saying there is an excuse. These are what we call mitigating circumstances and mitigating evidence. *These are things that you are required by law to consider*. . . . The state has said that it's unfair to let [Mr. Le] live and yet Hai is dead. But, see, the state[—]being the district attorneys here[—]didn't make the law. The legislature told you it is fair. It is fair to either give life or life without parole.

Tr. vol. IV, at 721-22 (emphasis added).

4. Prosecutorial Reference To Facts Not In Evidence

Mr. Le next argues that on four occasions, the prosecutors argued facts not in evidence. We now address each of these occasions in turn.

First, Mr. Le points out that during the guilt phase of the trial, the Assistant District Attorney suggested to the jury that the Nguyens had decided to confront Mr. Le about the theft of their stereo on the morning of Mr. Nguyen's death. Tr. vol. IV, at 581-82. There was in fact no evidence suggesting the Nguyens had made such a decision, but the Court of Criminal Appeals determined that this was an inadvertent mistake. See Le I, 947 P.2d at 555. Further, as the Court of Criminal Appeals noted, Mr. Le told the police that Mr. Nguyen had accused him of stealing the stereo the morning of the murder. See id. We agree with the Court of Criminal Appeals that the prosecutor's remark on this point appears inadvertent and did not render the trial unfair.

Second, Mr. Le objects to the portion of Mr. Macy's first-stage summation suggesting that Mr. Le had formed the intent to kill the Nguyens before leaving Cleveland for Oklahoma City. Tr. vol. IV, at 594. There was simply no evidence supporting this assertion. Nevertheless, the Court of Criminal Appeals determined that these remarks were harmless error. See Le I, 947 P.2d at 555. That Mr. Le's counsel did not object to these inferences at either stage of the trial and that his counsel did not directly challenge the inference is significant here.

Mr. Le suggests ways in which the prosecution's inference might be unreasonable, but, based on the facts presented at trial, his alternative proposals are no more or less reasonable than that of Mr. Macy. Mr. Le makes no credible argument as to why these comments made his trial fundamentally unfair, let alone how the Court of Criminal Appeals' determination was unreasonable.

Third, Mr. Le objects to the prosecution's misstatement of the record during the sentencing phase of the trial. Referring to the moment when Mr. Le purchased his plane ticket back to Cleveland after the murder, the Assistant District Attorney stated, "[The travel agent] says ['Y]ou here in town on business[?'] and [Mr. Le] snickers and says [']kinda[,'] as if it's no big deal, kinda, snicker, snicker." Tr. vol. IV, at 707. The record reveals that the travel agent in fact said, "I said[, 'A]re you here on business or pleasure[?'] And he said[, ']business kinda[.'] And so I ran the ticket and got it for him and gave it to him." Tr. vol. III, at 486. There was no testimony or other evidence that Mr. Le laughed or otherwise made light of his actions in Oklahoma City, and thus it is clear that the Assistant District Attorney misstated the testimony of the travel agent.

Mr. Le raised this argument on direct appeal, but the Court of Criminal Appeals' opinion in Le I did not specifically address it. See 947 P.2d at 554-56. We have found nothing in the Court of Criminal Appeals' decisions—either on

-32-

direct appeal or on state post-conviction review—to suggest that it considered Mr. Le's argument on this point. While we are required to give deference to a state court's adjudication of a claim, there is no indication that this specific claim was actually adjudicated. Because there is no prior adjudication to trigger 28 U.S.C. § 2254(d), we review this particular claim of prosecutorial misconduct *de novo*.

The Assistant District Attorney's comment was erroneous in that it mischaracterized trial testimony in order to show that Mr. Le was either remorseless or actually made light of the tragic events of that day. No evidence supports this characterization of the travel agent's testimony. This mischaracterization of the record is of concern given the weight with which jurors generally view a prosecutor's remarks. Since jurors usually have no access to the testimonial record during deliberation, the risk that the prosecution's characterization would be remembered in lieu of the correct statement by the ticketing agent is increased. Nevertheless, in light of the overwhelming evidence of Mr. Le's guilt and the evidence of aggravating factors supporting the death sentence—including other properly admitted evidence that supports the prosecution's contention that Mr. Le was remorseless about his actions—we cannot hold this one error rendered Mr. Le's sentencing fundamentally unfair.

Finally, Mr. Le objects to Mr. Macy's comments at the closing of the second stage of the trial which suggested that Mr. Le may have murdered

someone else before.  Mr. Macy stated, "All we know about [Mr. Le's past] is what he told us.  I submit to you in the end past behavior is the best predictor of future behavior. *It's kind of hard to believe that the man who would do what he has done never has done it before in his life*."  Tr. vol. IV, at 724-25 (emphasis added).  Mr. Le's counsel objected to this statement, although the record reveals that the court again failed to rule on the objection or admonish the jury not to consider this inappropriate statement.

This statement was challenged by Mr. Le in his original appeal, although the Court of Criminal Appeals neither expressly discussed it nor made a ruling on this point.  Thus, as with the prior comment, there was no adjudication of the claim, and we review the alleged misconduct *de novo*.

In Oklahoma, as in most states, evidence of prior crimes or bad acts normally is inadmissible to show a defendant's conformity with such crimes or acts.  See Okla. Stat. Ann. tit. 12, § 2404(B) (West 1993).  In order to introduce evidence of a prior crime under the limited exceptions to this rule, a prosecutor is required to show by clear and convincing evidence that a prior crime occurred in addition to satisfying other strict requirements.  See Burks v. Oklahoma, 594 P.2d 771, 774-75 (Okla. Crim. App. 1979), *overruled on other grounds by* Jones v. Oklahoma, 772 P.2d 922, 925 n.1 (Okla. Crim. App. 1989); cf. Jones, 772 P.2d at 924-25 (noting that defense counsel must object to the introduction of such

evidence in order for there to be error), *overruled on other grounds by* <u>Omalza v.</u>

<u>Oklahoma</u>, 911 P.2d 286, 291 (Okla. Crim. App. 1995).  There is no indication

that any of these exceptions applied in this case.  Hence, Mr. Macy's comments

on this point—comments insinuating without support that Mr. Le had previously

murdered—violate Oklahoma's rules of evidence and constitute error.

The question, however, is whether the comments, in light of the entire

proceeding, created a fundamentally unfair trial.  Because Mr. Macy did not

actually say that Mr. Le had previously killed anyone, because of the

overwhelming evidence of Mr. Le's guilt, and because of the evidence of

aggravating factors, we cannot hold that these comments—while unacceptable

from a prosecutor of Mr. Macy's experience, or from any prosecutor for that

matter—on their own rendered Mr. Le's sentencing fundamentally unfair.

5.  The Prosecutor Demeaned And Ridiculed Mr. Le

Mr. Le next objects to two sets of comments that allegedly ridiculed and

demeaned him in front of the jury.  In particular, Mr. Macy called Mr. Le "cold"

and "a small man in stature [who's] cold as an ice sickle [sic]."  Tr. vol IV, at

730-31, 735.  Mr. Macy also said, "[I]t takes a very special kind of a man to do

something that cold, that cruel and then not be bothered by it.  It takes a man like

this defendant who has no consciousness of guilt or remorse for his vicious acts."

Tr. vol. IV, at 743. The Court of Criminal Appeals determined that Mr. Macy, in describing Mr. Le as cold and calculating, was commenting on Mr. Le's lack of compassion and was not engaging in "unwarranted personal criticism or namecalling." Le I, 947 P.2d at 555. The Court of Criminal Appeals found the comment about Mr. Le's stature to be reasonable considering his height.

Personal attacks by a prosecutor are improper. See, e.g., Darden, 477 U.S. at 180-81 (describing the prosecutor's use of the term "animal" as improper); Childress v. Oklahoma, 1 P.3d 1006, 1014 (Okla. Crim. App. 2000) (discussing the prosecutor's referring to the defendant as a liar, comparing the defendant to a cornered rat, and characterizing him as "the worst of the worst" and stating that "we do not condone such borderline argument"); cf. Dennis v. Oklahoma, 879 P.2d 1227, 1234 (Okla. Crim. App. 1994) ("[P]ersonal attacks [by prosecutors against defense counsel] are clearly prohibited . . .."). Mr. Le's allegedly calculating nature was a broad theme of Mr. Macy's closing arguments, and in the present context there was sufficient evidentiary support such that the remarks on this point were not improper. And while we can imagine no appropriate basis for referring to Mr. Le's height in the closing argument, we do not believe this comment rendered the trial fundamentally unfair. Certainly, the Court of Criminal Appeals' holding on these comments was not unreasonable.

6.  The Prosecutor Argued That The Jury Had A Moral Duty To Find For The State

The last comment Mr. Le objects to is Mr. Macy's suggestion at the end of the sentencing phase that the jury "[could] only do justice in this case by bringing in a verdict of death." Tr. vol. IV, at 743. Mr. Le rightly suggests that it is error for a prosecutor to exhort a jury to impose a death sentence on the grounds of civic duty. See Viereck v. United States, 318 U.S. 236, 247-48 (1943) (rebuking a prosecutor for telling the jury that "[a]s a representative of your Government I am calling upon every one of you to do your duty"). On direct review in this case, the Court of Criminal Appeals noted that it had "specifically condemned many of the comments made in [the] second stage, stating [as to comments made by Mr. Macy,] '[t]here is no reason for them and counsel knows better and does not need to go so far in the future.'" Le I, 947 P.2d at 554 (quoting Duckett v. Oklahoma, 919 P.2d 7, 19 (Okla. Crim. App. 1995)) (alterations added and in original); see also Hooker v. Oklahoma, 887 P.2d 1351, 1367 (Okla. Crim. App. 1994) ("Such comments push the boundaries of permissible argument and we do not condone the prosecutor's disregard of the law and the trial court's warnings."); McCarty v. Oklahoma, 765 P.2d 1215, 1221 (Okla. Crim. App. 1988) (reversing a conviction, remanding for a new trial, and stating that "[s]uch argument was not based on evidence supporting any alleged aggravating

-37-

circumstance, but was simply a statement of Mr. Macy's personal opinion as to the appropriateness of the death penalty and, as such, was clearly improper."). We agree with the Supreme Court that such comments, when made by a prosecutor, are "offensive to the dignity and good order with which all proceedings in court should be conducted." Viereck, 318 U.S. at 248. The prosecutor has a duty not to misrepresent the law and not to misstate the jury's role. To the extent that Mr. Macy failed in this duty, his comments constitute error, although the Court of Criminal Appeals' opinion is not clear on whether that court considered these comments to be error. Regardless, in light of the overwhelming evidence of Mr. Le's guilt, evidence of aggravating factors supporting the death sentence, the general content of the instructions to the jury, the Court of Criminal Appeals' determination that Mr. Macy's comments did not render the trial fundamentally unfair is not an unreasonable application of federal law.

7. Brecht Footnote Nine

Mr. Le argues that a footnote in Brecht creates another basis upon which he is entitled to habeas relief with respect to his claims of prosecutorial misconduct. See 507 U.S. at 638 n.9. We note that the district court addressed Mr. Le's Brecht argument in a separate section of its opinion, and we did not grant a COA

with respect to this portion of the opinion.  Therefore, we decline to address this argument.

8. Cumulative Error

Mr. Le argues that, considered cumulatively, the errors and assertions of error already discussed were sufficient in aggregate to deprive him of a fundamentally fair trial.  This argument is similar to a traditional request for a cumulative error analysis.  Our cases on prosecutorial misconduct make it clear that we must consider all the complained of conduct *in toto* because individual, harmless prosecutorial errors can add up to make a trial fundamentally unfair in the aggregate.  See Trice, 196 F.3d at 1167.  When reviewing a case for cumulative error, only actual errors are considered in determining whether the defendant's right to a fair trial was violated.  See United States v. Rivera, 900 F.2d 1462, 1470-71 (10th Cir. 1990) (en banc) ("[A] cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.").

Although it is clear that the Court of Criminal Appeals addressed the cumulative effect of the majority of the improper comments, see Le I, 947 P.2d at 556 ("Under the circumstances of this case, a thorough review of the record shows the combined effect of the errors in argument did not prejudice Le."), it did

not consider the cumulative prejudicial impact of the two sentencing stage errors it failed to adjudicate.[11]  Accordingly, this aspect of the Court of Criminal Appeals' adjudication of Mr. Le's cumulative prosecutorial misconduct claim "was contrary to, or involved an unreasonable application of, clearly established federal law," 28 U.S.C. § 2254(d)(1), and therefore we examine this part of the cumulative error issue *de novo*.  See Hooks v. Ward, 184 F.3d 1206, 1223 (10th Cir. 1999).  Because of the deference we usually accord state court decisions, we give some deference to the Court of Criminal Appeals' cumulative error analysis as far as it went.  See Le I, 947 P.2d at 556 (finding no cumulative error sufficient to reverse Mr. Le's conviction and sentence based on the errors of the "super aggravator" argument and the misstatement suggesting Mr. Le formed the intent to kill the Nguyens before leaving Ohio).  Thus, we focus on whether the two errors not addressed by the Oklahoma courts—the misstatements about Mr. Le snickering and the impermissible inference that Mr. Le had murdered before, both offered during closing arguments during sentencing—would tip the scales in light of the Court of Criminal Appeals' ruling on the cumulative impact of the other

---

[11] As already noted, it is unclear from Le I whether the Court of Criminal Appeals considered the civic duty argument to be error.  At a minimum, that court held that these comments did not render the trial fundamentally unfair.  See Le I, 947 P.2d at 555-56.  Even if we assume that the prosecutor's argument on this point was found to be error, its inclusion in the cumulative error analysis below does not change our outcome.

errors. Further, because these two unadjudicated errors occurred during the sentencing phase, we will only consider whether the sentencing requires reversal.

When a state seeks to take a defendant's life, the Eighth Amendment requires that the proceedings conform to a heightened degree of reliability. See Caldwell, 472 U.S. at 328-30, 340. As this court has noted, "the Court in Darden indicated that prosecutorial misconduct may be grounds for habeas relief when it 'manipulate[s] or misstate[s] the evidence . . .'" Paxton, 199 F.3d at 1218 n.10. Here, one of the new errors involves a misstatement or mischaracterization of the evidence that came during closing arguments. We also have the impermissible inference made during closing arguments that Mr. Le had murdered before, something of which there was absolutely no evidence. These statements risk inflaming the passions of the jurors, for they encourage the jurors to attribute a higher level of culpability to the defendant than was actually present.

The comments we have discussed were, overall, inappropriate. Nevertheless, the general preceding discussion—including its consideration of the jury instructions, the failure of Mr. Le's counsel to object to many of Mr. Macy's comments, the overwhelming evidence of Mr. Le's guilt, and evidence revealing the presence of aggravating factors—convinces us that the jury was able to judge the evidence fairly in light of the prosecutor's conduct. See Tillman, 215 F.3d at 1129. Therefore, the sentencing was not rendered fundamentally unfair by the

cumulative effect of the errors found, and Mr. Le is not entitled to habeas corpus relief on his assertions of prosecutorial misconduct.

C. Ineffective Assistance of Trial Counsel

Mr. Le argues that his trial counsel was ineffective during both the guilt and sentencing phases of the trial under standards established by the Sixth Amendment. Regarding the guilt phase, Mr. Le complains that his counsel did not subject the state's case of first-degree murder to adequate adversarial testing, as evidenced by trial counsel's failure to cross-examine Mrs. Nguyen or to call Mr. Le himself as a witness during this stage; by counsel's failure to ask for instructions on self-defense; and by counsel's failure to contest the prosecution's theory of the case. Further, Mr. Le points to evidence suggesting that his trial attorney saw Mr. Le's case as hopeless and that his attorney was prejudiced against Asians. With respect to the sentencing phase, Mr. Le complains that trial counsel failed to object to Mr. Macy's inappropriate theories and comments and that counsel improperly focused on ingratiating himself with the jury rather than on forwarding a meaningful defense to the imposition of a death sentence.

1. Standard of Review For Ineffective Assistance of Trial Counsel Under

AEDPA

In his briefs in the direct appeal of his criminal conviction, Mr. Le raised

all but one of his ineffective assistance of counsel claims.[12]  The opinion in Le I

reveals that the Court of Criminal Appeals applied the federal law we discuss

below.  See Le I, 947 P.2d at 556.  Therefore, we can only grant habeas corpus

relief to Mr. Le on this issue if, in addition to his counsel's unprofessional errors,

we determine that the Court of Criminal Appeals unreasonably—rather than

merely incorrectly— applied the Sixth Amendment law.  See Thomas, 218 F.3d at

1219-20 (applying AEDPA).

To succeed in a claim of ineffective assistance of counsel, a petitioner must

establish two elements.  He must prove first that counsel's performance was

---

[12] The only argument now forwarded by Mr. Le that was not raised in the direct appeal of his criminal conviction is the contention that Mr. Le's trial attorney thought Mr. Le's case was hopeless and that the trial attorney was prejudiced against Asians.  The appellee failed to respond to this argument in its brief, which would normally mean that we would review Mr. Le's arguments on this point *de novo*.  See Moore, 195 F.3d at 1178 ("Because respondent does not argue petitioner failed to exhaust any claims or that any claims are procedurally barred, . . . we review the claim [not] decided by the Oklahoma Court of Criminal Appeals . . . de novo.").  But since a petitioner must point to specific errors or omissions by trial counsel in order to succeed on an ineffective assistance claim, see United States v. Cronic, 466 U.S. 648, 663-67 (1984), and since the evidence on this point only relates to Mr. Le's trial counsel's background and not to any specific failures at trial, we view this evidence as being submitted merely in support of Mr. Le's arguments on the specific ineffective assistance of counsel arguments addressed by the Court of Criminal Appeals.

deficient—in other words, the petitioner must show that counsel made errors so serious that he or she was not acting as the 'counsel' guaranteed by the Sixth Amendment. See Strickland v. Washington, 466 U.S. 668, 687 (1984). Second, a petitioner must show that counsel's deficient performance prejudiced the defense, depriving the petitioner of a fair trial with a reliable result. See id.

To succeed under the first prong, a petitioner must overcome the presumption that counsel's conduct was constitutionally effective. See Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999). Specifically, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689 (internal quotation marks omitted). For counsel's performance to be constitutionally ineffective, it must have been "completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." See Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997) (quoting Hatch v. Oklahoma, 58 F.3d 1447, 1459 (10th Cir. 1995)).

Under the second prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. If the alleged ineffective assistance occurred during the guilt stage, the question is whether there is a reasonable probability the jury would have had reasonable

doubt regarding guilt. See id. at 695. If the alleged ineffective assistance of counsel occurred during the sentencing phase, this court considers whether there is a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. In assessing prejudice, this court examines the totality of the evidence, not just the evidence helpful to the petitioner. See Boyd, 179 F.3d at 914. "This court may address the performance and prejudice components in any order, but need not address both if [petitioner] fails to make a sufficient showing of one." Cooks v. Ward, 165 F.3d 1283, 1292-93 (10th Cir. 1998); see also Davis v. Executive Dir. of Dep't of Corrections, 100 F.3d 750, 760 (10th Cir. 1996).

2. Ineffective Assistance of Counsel During Guilt Phase

a. Counsel's Failure to Cross Examine Mrs. Nguyen

Mr. Le notes the prosecution's reliance on Mrs. Nguyen as the only eye-witness to the events surrounding Mr. Nguyen's death. Mr. Le points out that his version of events conflicts in varying degrees with that of Mrs. Nguyen but that his trial counsel failed to cross-examine Mrs. Nguyen during the guilt phase of the trial. While Mr. Le admits that their testimony is in agreement on various issues—including the fact that Mr. Le intended to rob the Nguyens, that he was

the initial aggressor that morning, that he was the person who went to the kitchen and grabbed the knives—there are a few relevant points of difference. In particular, Mr. Le points out that Mrs. Nguyen, at the preliminary hearing, suggested that her husband had held on to Mr. Le during the altercation and that she had retained control of the barbell during the duration of the fight. Mrs. Nguyen's testimony at trial conflicted with her earlier testimony on these two points.

Mr. Le suggests that the conflict should have been brought to the jurors' attention, as Mrs. Nguyen's initial testimony "was far more supportive of [Mr.] Le's version of the fight. . ." Aplt's Br. at 51-52. Mr. Le argues that this information might have affected the trial in three ways. First, his counsel might have convinced the court to give the requested instruction on first degree manslaughter. Second, the court might have given an instruction on self-defense. And third, Mr. Le suggests that this conflict in Mrs. Nguyen's testimony would have exposed the altercation as a crime of passion, rather than as a premeditated, calculated effort to murder and rob the Nguyens. Mr. Le claims that there is no trial strategy that could justify his counsel's failure to impeach Mrs. Nguyen with her own prior testimony.

The Court of Criminal Appeals explained that raising these inconsistencies before the jury would not have had any of the proposed effects. As there was

adequate evidence that Mr. Le remained the aggressor during the altercation, this inconsistency in Mrs. Nguyen's testimony would not have allowed for an instruction on self-defense. See Le I, 947 P.2d at 556-57. Further, regardless of the inconsistencies of Mrs. Nguyen's testimony, there was no evidence that adequate provocation existed to entitle Mr. Le to a manslaughter instruction. See id. Finally, Mrs. Nguyen's testimony at trial was supported by Mr. Le's confession, which means her conflicting testimony would not have been impeachable by Mr. Le at trial. For these reasons, the Court of Criminal Appeals held that trial counsel's decision not to argue with Mrs. Nguyen was a reasonable trial strategy and Mr. Le could not show prejudice, as required to succeed in a claim of ineffective assistance of counsel. See id. at 557. In light of its persuasive reasoning, we hold that the Court of Criminal Appeals' analysis on this point was not an unreasonable application of federal law.

### b. Counsel's Failure to Call Mr. Le As A Witness

Mr. Le also objects to his counsel's failure to call him as a witness during the guilt phase of the trial. Mr. Le contends that if he had been called, he would have been able to introduce evidence in support of his theory that he only came to Oklahoma City to reclaim the $10,000.00 he felt he was owed by the Nguyens. The Court of Criminal Appeals noted that regardless of whether Mr. Le intended to rob the Nguyens or simply to reclaim $10,000.00 that was allegedly his,

sufficient evidence existed to show that Mr. Le formed the intent to murder Mr. Nguyen. See Le I, 947 P.2d at 557. The Court of Criminal Appeals also held that Mr. Le failed to show he was prejudiced by trial counsel's failure to raise this point. See id.

Had Mr. Le's trial counsel called him to the stand during the guilt stage of the trial, Mr. Le would have had to address the inconsistency in his initial statement to the police, which said nothing about the alleged business plan between Mr. Le and Mr. Nguyen. While Mr. Le rightly points out that this conflict had to be addressed anyway during the second stage when he raised the issue of the money, it is not beyond reason to imagine that his attorney deemed it better not to have Mr. Le impeached in a fundamentally-significant manner during the guilt stage of the trial. When a person is on trial for robbery and capital murder, among other charges, we do not think it an obviously incorrect trial strategy to avoid having the defendant impeached in this way. At the very least, under AEDPA, we cannot hold the Court of Criminal Appeals' ruling on this matter to be an unreasonable application of federal Sixth Amendment law.

c. Counsel's Failure To Request A Self-Defense Instruction

Mr. Le objects to his counsel's failure to request any self-defense instructions at the first stage of the trial. The Court of Criminal Appeals stated that such an instruction could not have been given, "[e]ven giving [Mr.] Le the

benefit of every possible doubt [based on] this evidence. . ." Le I, 947 P.2d at

547. In Oklahoma, self-defense is not available to an aggressor. See Ruth v.

Oklahoma, 581 P.2d 919, 922 (Okla. Crim. App. 1978). Even assuming that Mrs.

Nguyen had retained the barbell so as to threaten Mr. Le or that Mr. Nguyen had

picked up the bar Mr. Le allegedly dropped and then used it to fight back, the

Court of Criminal Appeals determined that Mr. Le never ceased being the

aggressor. See Le I, 947 P.2d at 547. We agree. For this reason, it cannot have

been error for his counsel not to request a self-defense instruction. There being

no error, the Court of Criminal Appeals did not unreasonably apply federal law on

this point.

### d. Counsel's Insufficient Closing Arguments

Mr. Le argues that his trial attorney made at least two errors in the closing

arguments during the guilt phase. Mr. Le complains that his attorney conceded

Mr. Le's guilt by explaining to the jury why Mrs. Nguyen was not cross-

examined. Mr. Le also suggests that it was error for his trial attorney never to

argue Mr. Le's version of the events to the jury.

With respect to the first point, Mr. Le's attorney said to the jury:

Now this has been a short trial. The state mentioned, for example, that
the victim's wife [was not] cross-examine[d]. Well, one thing I'll tell
you is that I don't want to start with and insult your intelligence and I
wouldn't insult her. . . .

I didn't say [Detective Bemo] cheated or planted evidence or inferred

-49-

that he was racially biased or prejudiced because he's not.

And I didn't insult your intelligence or him by inferring that. . . .

This trial wasn't a circus. This wasn't a mockery of the system. This system didn't have bumbling prosecutors or bumbling police or things of that nature. This case was put on in an orderly manner and you as jurors take that into consideration and determin[e] this case based upon the facts and the law that you have here.

Tr. vol. IV, at 587-90.

While Mr. Le argues that these comments concede Mr. Le's guilt, taken in context and "[g]iven the first stage evidence, [they appear] to be a reasonable attempt [by counsel] to ingratiate himself and, by extension, [Mr.] Le with the jury." Le I, 947 P.2d at 557. As already discussed, attempting to impeach Mrs. Nguyen would not necessarily have benefitted Mr. Le, and this statement does not in fact concede Mr. Le's guilt. Therefore, we cannot hold that the Court of Criminal Appeals' conclusion on this point was unreasonable.

As for Mr. Le's argument that counsel should have at least mentioned Mr. Le's theory during the guilt stage of the trial, we have concerns that counsel may have abdicated his responsibility in this respect. It seems that Mr. Le's trial counsel apparently had little in the way of strategy during the guilt phase except to challenge the validity of Mr. Le's confession and not to insult the jury by attacking Mrs. Nguyen or the police. However, a review of the trial transcript shows that trial counsel made objections, cross-examined witnesses, and argued

-50-

legal points to the judge. Although from this record we cannot discern a comprehensive strategy, we cannot conclude that the Court of Criminal Appeals' determination on counsel's failure explicitly to present Mr. Le's theory was unreasonable.

3. Ineffective Assistance of Counsel During the Sentencing Phase

As a final argument on this topic, Mr. Le states that trial counsel's failure to object to Mr. Macy's inappropriate comments during the sentencing stage reveals ineffective assistance of counsel. As already discussed, in order to prevail on an ineffective assistance claim concerning a capital sentence, the petitioner must show that if he had objected to the prosecutor's comments, "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. Because of the overwhelming amount of evidence of Mr. Le's guilt and evidence of aggravating factors supporting the death sentence, as well as the lack of any indication that Mr. Macy's comments rendered the trial fundamentally unfair, we cannot conclude that the Court of Criminal Appeals' determination of this issue was contrary to the Strickland analysis.

4. The Overall Effectiveness of Mr. Le's Trial Counsel

The large amount of evidence against Mr. Le suggests that his trial counsel may not have had many viable strategies. The ones that seem obvious include: (1) requesting a self-defense instruction; (2) attempting to have the confession suppressed for lack of a knowing and intelligent waiver of <u>Miranda</u> rights; (3) introducing evidence to support a heat-of-passion or other, non-premeditated murder imperfect defense; and (4) focusing the jury on the factors mitigating against the imposition of the death penalty in the sentencing stage of the trial. As already discussed, the self-defense argument was rejected by the Court of Criminal Appeals based on the lack of any evidence to support such an instruction.

As to these other possible strategies during the guilt phase, it is clear that trial counsel attempted to challenge Mr. Le's confession, and counsel made at least a minimal effort to pursue a heat-of-passion imperfect defense. Mr. Le's trial counsel also attempted, albeit unsuccessfully, to get information about the purported $10,000.00 loan into evidence during the first stage of the trial without calling Mr. Le or cross-examining Mrs. Nguyen. Trial counsel also asked questions of witnesses during the course of the first stage that were apparently intended to support some kind of theory that involved implicating the Nguyens as participants in a narcotics operation of some kind. While there was no evidence

whatsoever presented to support this proto-theory, at the least it shows that Mr. Le's counsel was attempting to advance other possible defenses. Additionally, it is apparent that counsel decided to focus on the sentencing phase of the trial.

In closing, we note that throughout the trial, Mr. Le's counsel objected to the answers of various witnesses and objected to questions asked by the prosecution. While with hindsight we might postulate that Mr. Le's counsel could have done a better job, the Court of Criminal Appeals' determination that Mr. Le received constitutionally sufficient assistance of trial counsel does not reveal an unreasonable application of federal law. Mr. Le's request for relief on this matter is denied.

## V. CONCLUSION

For the aforementioned reasons, we AFFIRM the district court's denial of Mr. Le's request for federal habeas corpus relief.

No. 00-6333, <u>Le v. Mullin</u>

**HENRY**, Circuit Judge, concurring.

I concur in both the reasoning and the outcome of the panel's opinion. In this case, the evidence against Mr. Le is overwhelming, the jury was given enough guidance to fairly perform its duty, and finally, we are generally constrained by AEDPA's deferential standard of review. These three factors together dictate that we deny Mr. Le's appeal on this issue because we cannot conclude that the Court of Criminal Appeals unreasonably applied federal law or that Mr. Le is otherwise entitled to relief. I write separately, however, to voice my concern regarding the prosecutorial misconduct that seems to have played a not insignificant role in this case.

Prosecutorial misconduct at trial has routinely been the issue of post-conviction litigation. While it is true that any prosecutor will have his share of trial-outcome challenges, over the last fifteen years, the Oklahoma County District Attorney's office has been cited for actions deemed improper,[1]

---

[1] <u>Fowler v. Ward</u>, 200 F.3d 1302, 1314 (10th Cir. 2000) ("I believe the prosecutor's comments improperly associated Mr. Fowler with Mr. Fox's confession.") (Ebel, J., concurring), <u>overruled on other grounds by</u> <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000) (as recognized by <u>Moore v. Marr</u>, 254 F.3d 1235, 1239 (10th Cir. 2001)).

"egregiously improper,"[2] deceitful and impermissible in striking foul blows,[3] deplorable,[4] "perhaps inappropriate,"[5] worthy of condemnation,[6] and, in this very case, "condemned" and "certainly error."[7]  Actions by that office have been the basis for the invalidation of both sentences[8] and capital convictions.[9]  It is hard to formulate any kind of justifiable characterization of the conduct in the present

---

[2] Hooks v. Oklahoma, 19 P.3d 294, 314 (Okla. Crim. App. 2001) ("Prosecutors misused evidence in the first stage of the trial and engaged in egregiously improper argument which we have often condemned.").

[3] Paxton v. Ward, 199 F.3d 1197, 1216, 1218 (10th Cir. 1999) ("In closing argument, Mr. Macy took advantage of Mr. Paxton's inability to present the reason for the dismissal, deceitfully telling the jury that Mr. Paxton had failed to avail himself of the opportunity to counter the state's case and inviting the jury to draw an adverse inference from that failure. . . .   We thus have no doubt that Mr. Macy's conduct crossed the line between a hard blow and a foul one . . .").

[4] McCarty v. Oklahoma, 765 P.2d at 1221 ("This Court will not stand idly by 'wring[ing] its hands' expressing nothing more than 'a ritualistic verbal spanking' and an 'attitude of helpless piety' in denouncing the deplorable conduct of prosecutors such as we have found in this case.") (quoting Darden v. Wainwright, 477 U.S. 168, 205-06 (1986) (Blackmun, J., dissenting)).

[5] Trice v. Ward, 196 F.3d 1151, 1167 (10th Cir. 1999) ("some of the comments made by the prosecutor were perhaps inappropriate. . .").

[6] Duckett v. Oklahoma, 919 P.2d 7, 19 (Okla. Crim. App. 1995) (noting comments that "have been expressly condemned by this Court as being overly prejudicial to a defendant").

[7] Le I, 947 P.2d at 554-55.

[8] See, e.g., Paxton, 199 F.3d at 1220 (requiring a new sentencing in a capital conviction because of the district attorney's misconduct).

[9] See, e.g., McCarty, 765 P.2d at 1222.

case, for the comments push hard against the boundaries of propriety.

An experienced prosecutor should know better—especially considering the frequent criticism of his tactics by both state and federal courts—and should be willing to follow the law he has sworn to uphold. The prosecution's actions in this case suggest defiance of Oklahoma courts and disregard for Oklahoma law. Further, in cases like Mr. Le's in which there is more than sufficient evidence to secure a conviction, such actions may require an appellate court to order a new trial or sentencing in spite of an otherwise solid case.

In our Anglo-American heritage and Western tradition, the virtue of justice is frequently depicted as a woman wielding both a broadsword representing her power and scales representing her reliance on reason. To show justice's aversion to passion, prejudice, or preference, she is shown blind-folded. If we allow justice to strike foul blows, even at a deserving target, we cheapen a virtue by clothing it in a vice. The rules of law and the rule of law apply to the government no less than to the governed. Professional prosecutors—as well as others who have a similar commitment to fairness—do their job every day without resorting to the tactics that jeopardized this conviction. It is all too easy to see how a prosecutor, armed with strong evidence of a defendant's guilt, might take advantage of the jury's trust by improperly encouraging it to impose a sentence not commensurate with the defendant's actual moral culpability. Because of the

district attorney's actions, I must add my voice to that of the Oklahoma Court of Criminal Appeals. To allow prosecutors to make the kinds of statements advanced here not only threatens the fairness of trials but jeopardizes proper convictions.[10]

I am cognizant that in many of the cited cases, the petitioner was unable to demonstrate that the prosecutorial misconduct affected the result of the trial. However, in spite of the absence of such prejudice in individual cases, at some point the repeated violation of ethical responsibility threatens the foundations of our justice system. As the late Judge Alvin B. Rubin observed in a historically important case where the prosecutor's actions were unjust, "justice requires more than a proceeding that reaches an objectively accurate result; trial by ordeal might by sheer chance accomplish that. It requires a proceeding that by obvious fairness

---

[10] Trial courts also must play an important role in policing overzealous prosecutors, as both state and federal trial courts generally have greater ability immediately to correct or minimize prosecutorial error and also have more leeway to impose sanctions on prosecutors than an appellate court, which generally may only undertake the severe action of overturning a conviction. See, e.g., United States v. Wilson, 149 F.3d 1298, 1303-04 (11th Cir. 1998) (noting the importance of sanctioning individual prosecutors at the trial level for persistent misconduct); United States v. Beckett, 706 F.2d 519, 521-22 (5th Cir. 1983) (after noting that "error frequently repeated must be corrected" and that "[n]either the blundering prosecutor nor the blundering constable should be permitted to blunder forever", ordering the district court to hold a hearing on whether to subject a prosecutor to disciplinary action). Additionally, other methods of addressing prosecutorial misconduct exist. See Bennett L. Gershman, Prosecutorial Misconduct § 14:12 (2d ed. 2001) (discussing discipline by the legal profession).

helps to justify itself."[11]

Finally, I recognize that the Oklahoma County District Attorney's Office has done much efficient work over the years. But as the cases chronicled by the Oklahoma Court of Criminal Appeals show, some prosecutors in that office over the last fifteen years, have repeatedly and seriously crossed the line in capital cases. I have voiced my concerns to warn against conduct that threatens otherwise valid convictions and to encourage more ethical behavior in the future.

---

[11] <u>United States v. McDaniels</u>, 379 F. Supp. 1243, 1249 (E.D. La. 1974).