**Robert L. SCOTT, Jr., Petitioner,**

v.

**Jay SHELTON, et al., Respondents.**

**No. CIV.A. 02–3240–KHV.**

United States District Court,
D. Kansas.

Dec. 16, 2003.

Robert L. Scott, Norton, KS, pro se.

Kristafer R. Ailslieger, Office of Attorney General, Lee J. Davidson, Office of Attorney General, Topeka, KS, for Respondents.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Pursuant to 28 U.S.C. § 2254, Robert L. Scott seeks a writ of habeas corpus based on ineffective counsel and cumulative error. For reasons stated below, the Court denies the petition.

## I. Procedural Background

On April 1, 1998, the Clay County Attorney filed criminal charges against Scott for (1) aggravated criminal sodomy with a child in violation of K.S.A. § 21–3506(a)(1); (2) aggravated indecent liberties with a child in violation of K.S.A. § 21–3504(a)(3)(A); and (3) attempted aggravated criminal sodomy with a child in violation of K.S.A. §§ 21–3506(a)(1) and 21–3301. See Doc. # 24 in *Kansas v. Scott*, Case No. 98CR18 in the District Court of Clay County, Kansas. On July 1, 1998, a jury found Scott not guilty of aggravated criminal sodomy with a child, but guilty of aggravated indecent liberties with a child. As to the third charge (attempted aggravated criminal sodomy with a child), the jury found Scott guilty of the lesser included offense of aggravated indecent liberties with a child. See Docs. # 94–95 in Case No. 98CR18. On August 25, 1998, the state district court set aside the conviction on the third charge,[1] see Docs. # 116–117 in Case No. 98CR18, leaving only the conviction on the second charge for aggravated indecent liberties with a child. For this crime, the court sentenced Scott to 77 months in prison.

Scott appealed his conviction, arguing only one issue: that the district judge had improperly engaged in *ex parte* communications with a child witness, in violation of Scott's constitutional rights to confrontation and due process. See *Brief of Appellant* in *Kansas v. Scott*, Case No. 98–82119–A in the Court of Appeals of the State of Kansas. On September 24, 1999, the Kansas Court of Appeals affirmed Scott's conviction, finding that he had not properly preserved the issue for appeal

---

1. Respondents maintain that the district court found that aggravated indecent liberties with a child was not a lesser included offense of attempted aggravated criminal sodomy, see respondents' *Answer And Return* (Doc. # 22)

filed March 14, 2003 at 3, but the court's journal entry does not state the reason for the decision. See Docs. # 116–117 in Case No. 98CR18. The reason for the decision is not material to the Court's ruling herein.

because trial counsel had not objected to the *ex parte* conference at trial. *See Memorandum Opinion* at 2, Case No. 98–82119–A. The Court of Appeals further found that Scott had not presented direct or indirect evidence of witness coaching by the trial court and that appellate review was not necessary to serve the ends of justice or to prevent a denial of fundamental rights. *Id.* at 3. The Kansas Supreme Court denied review.

On December 7, 2000, Scott filed a motion for post-conviction relief under K.S.A. § 60–1507, asserting ineffective assistance counsel at trial and on appeal. *See* Docs. # 2–8 in *Scott v. Kansas,* Case No. 00C48 in the District Court of Clay County, Kansas. Specifically, Scott asserted that trial counsel had failed to object to (1) the prosecutor's improper remarks in closing argument and (2) the judge's *ex parte* communication with the child witness. Scott complained that appellate counsel (1) had failed to raise the issue of prosecutorial misconduct and (2) incorrectly argued the issue regarding the *ex parte* communication. *See* Doc. # 6 in Case No. 00C48. Scott also sought reversal based on cumulative error. On December 26, 2000, the state district court denied Scott's motion for post-conviction relief. *See* Docs. # 52–54 in Case No. 00C48. Scott appealed to the Kansas Court of Appeals, which affirmed. *See Memorandum Opinion* dated February 8, 2002 in *Scott v. Kansas,* Case

No. 86,755. The Kansas Supreme Court again denied review.

On August 7, 2002, Scott filed a petition for writ of habeas corpus in this Court, asserting essentially the same arguments that he raised in his motion for post-conviction relief in state court.

## II. Evidence At Trial

Scott's trial in state court was a two-day jury trial on June 30 and July 1, 1998.[2] At the time of trial, J.P., the alleged victim, was twelve years old. J.P. lived with his aunt and uncle, Anita and Kyle Pruyn. Tr. 46, 193. J.P.'s mother died when he was three years old, and Anita and Kyle thereafter became his legal guardians. Tr. 47, 172, 186. Anita and Kyle had three other children—Junior, Sky and Dennis—who were younger than J.P. Tr. 65, 172. From March through mid-July of 1997, Scott (who is Anita's brother) lived in a trailer next to the Pruyn family home.[3] Tr. 154, 173–75.

### A. First Alleged Crime—Aggravated Criminal Sodomy With A Child

At trial, J.P. testified that the first incident occurred in July of 1997, on the night of a terrible thunderstorm. *Transcript Of Jury Trial* at 50. J.P. recounted that he washed the dishes, then went to bed in the room which he shared with his younger brother, Junior. Tr. 51, 77. J.P. remem-

---

**2.** Scott did not testify at trial. The six witnesses were J.P., the victim; Junior, the victim's brother, Anita and Kyle Pruyn, the victim's legal guardians; Kelly Kemp, investigator for the Clay County sheriff; and Tom Bartlett, Scott's probation officer. The jury also viewed a videotape of interviews which Kemp had conducted with J.P., Junior and Anita. Tr. 205–07. The videotape was not offered into evidence, and it was not transcribed. *Id.* The parties have not included the videotape in the record before this Court.

**3.** The exact date of Scott's departure is unclear. In an interview with Kemp, Anita said that Scott left around July 9, 1997, because of dispute over an alleged debt to Anita and Kyle. Tr. 154–55. At trial, Anita testified that Scott left in late July or early August. Tr. 175. Anita said that one morning she discovered Scott was gone. Tr. 175–76. Scott left all of his personal belongings in the trailer and did not come back to retrieve them. Tr. 177. Scott had planned to stay for the whole summer and had not told Anita that he was leaving early. Tr. 176.

bered that when he went to bed, the rest of the family was already asleep and it was raining and lightning outside. 77–79. J.P. stated that the next thing he remembered was waking up on his stomach with no pants in Scott's bed, with Scott, who was naked, lying on top of him. Tr. 51–54, 79–80. J.P. said that he did not know how he got to Scott's trailer, and that he did not recall going outside, getting wet, seeing lightning or hearing thunder. Tr. 78–79. According to J.P., Scott said that he was humping J.P., or going up and down and pretending like J.P. was a girl. Tr. 51, 79–80. J.P. testified that Scott did not put anything inside him, but that he remembered seeing a bottle of liquid soap beside the bed. Tr. 53–58. J.P. also said that he discovered a lot of soap on his bottom. Tr. 55–56, 80–83. J.P. testified that the incident ended when Scott saw a light outside. After that, Scott got up and put their pants on. Tr. 53–54, 81–82. Anita then came to the trailer and took J.P. home. Tr. 54–55. J.P. testified that Anita told him that if she heard of anything happening that night "she would do something about it." [4] Tr. 82. J.P. did not tell her about the incident because Scott had threatened to beat him up if he did. Tr. 57, 82. J.P. recounted that he thought Anita must have known what was happening because the liquid soap was beside Scott's bed. Tr. 228.

In earlier statements, J.P. had given differing stories about how the first incident ended. About three months before trial, at the preliminary hearing on March 29, 1998, J.P. testified that the incident ended when he woke up. Tr. 97, 107. Specifically, J.P. stated that when he woke

up, Scott put their pants on and J.P. went away from the bed and sat down in a chair. Tr. 97. In this testimony, J.P. did not mention liquid soap. Tr. 97. Almost a year before trial, on August 11, 1997, J.P. told Kemp that the first incident ended when Anita came into the trailer. Tr. 146. J.P. said that Anita saw what was going on and told Scott that if she ever heard of or caught him doing it again she would tell the police. Tr. 99, 146. In a second interview with Kemp, J.P. stated that he woke up when Anita came into the trailer and Scott pushed him to the floor and told him to pretend like he was sleeping. Tr. 158. J.P. did not mention liquid soap to Kemp. Tr. 169.

At trial, Kemp testified that he interviewed Scott on September 4, 1997. Tr. 138. Kemp said that his first question to Scott was, "Tell me about the night of the storm." Tr. 138. Scott replied that J.P. had been over at his trailer and that Anita came over and found him and took him back to their house. Tr. 139. Kemp asked how Scott knew the night to which he was referring. Tr. 139. Scott responded that Tom Bartlett (his probation officer) had told him the reason for the interview and that one of the incidents had supposedly taken place on the night of the storm. [5] Tr. 139. Kemp had not said anything to Bartlett about the storm, so he stopped the interview and called Bartlett. Tr. 139–40. Bartlett told Kemp that he did not know anything about the storm and that he had not said anything to Scott about a storm in reference to the investigation. Tr. 139, 201–04.

---

4. Anita testified that when she brought J.P. back to the house, she told him that if she found out that anything had happened in the trailer, someone would be in a lot of trouble. Tr. 228–29. Anita stated that she knew that J.P. was afraid of the dark and would never

have left the house alone at night. Tr. 229. Anita did not say what she thought might have happened in the trailer.

5. The jury did not hear the fact that Bartlett was a probation officer. Tr. 33, 139.

## B. Second Alleged Crime—Aggravated Indecent Liberties With A Child

At trial, J.P. testified that the second incident occurred on the day after the thunderstorm. Tr. 57. J.P. said that he and his brothers and sister were watching television in their parents' bedroom. Tr. 57–59. J.P. stated that Scott told the other kids to go outside and play and not return until he told them to. Tr. 59, 83–84. J.P. testified that Scott told him to shut the door. Tr. 59. J.P. asked why, and Scott replied that he was horny. Tr. 59. J.P. replied that he did not care and tried to go outside. Tr. 59. J.P. said that Scott grabbed him, put him on the bed, pulled down both of their pants and began fondling J.P.'s penis. Tr. 59–60, 84. J.P. said that he was lying on his left side, with Scott lying behind him and holding his head and neck down so that he could not get up. Tr. 60–62, 85. J.P. testified that Scott did not touch him from behind or put anything inside him. Tr. 63. According to J.P., Scott stopped the activity when he heard a noise and saw Junior peeking in the window from outside. Tr. 63, 85–86, 91–92. J.P. said that Scott threatened to beat him up and take him out in the country and shoot him if he told anyone about the incident. Tr. 64. Anita and Kyle were not home at the time. Tr. 64, 86.

J.P.'s story varied slightly at the preliminary hearing and in his interviews with Kemp. At the preliminary hearing, J.P. testified that Scott shut the bedroom door after he told the other kids to go outside and play. Tr. 102. J.P. told Kemp that Junior was the last child to leave the room and that he closed the door behind him. Tr. 147. J.P. also told Kemp that Scott had pulled J.P. onto the bed before he said that he was horny. Tr. 147. J.P. told Kemp that Scott partially inserted his penis but that J.P. avoided full penetration by continually shifting his position. Tr. 148. J.P. told Kemp that the second incident happened two weeks after the storm. Tr. 147.

Junior corroborated J.P.'s testimony at trial. Junior remembered looking into the bedroom window and seeing J.P. and Scott "having sex." Tr. 119, 122. Specifically, Junior testified that Scott was lying behind J.P. with his "dick" on J.P.'s "butt." Tr. 123. Junior recounted that J.P.'s pants were pulled down and that Scott's pants were open in the front. Tr. 123–24. In Junior's interview with Kemp, however, Junior stated that J.P. and Scott were completely naked and that J.P. was lying on one side of the bed and Scott was on the other side. Tr. 151.

## C. Third Alleged Crime—Attempted Aggravated Criminal Sodomy With A Child

At trial, J.P. testified that the third incident happened on the second day after the storm. Tr. 65–66, 87. J.P. testified that he was in the bathroom collecting dirty clothes for the laundry when Scott came into the bathroom, shut the door and told him to lean over the bathtub. Tr. 67, 87. J.P. said that Scott then put liquid soap into J.P.'s bottom and penetrated it with his penis. Tr. 68, 87. J.P. reported that he had a bowel movement afterwards and saw a lot of blood in the toilet. Tr. 70, 89.

During his interview with Kemp and at the preliminary hearing, J.P. said that the third incident happened within a day or two after the second incident. Tr. 104–05, 148. J.P. said that he was lying down on the living room floor when Scott laid down behind him and tried to insert his penis into J.P.'s behind. Tr. 148–49. J.P. told Kemp that the incident ended abruptly, without penetration, because Scott heard a neighbor pull up in the yard. Tr. 105, 149. J.P. did not mention liquid soap. Tr. 169.

At trial, J.P. testified that he was nervous and scared during the interview with Kemp and at the preliminary hearing and that everything was "coming back" to him on the day of trial. Tr. 108–11. J.P. also said that during the interview and at the preliminary hearing, he had made stuff up "a little bit." Tr. 114.

## III. Legal Standards

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2255 (incorporating 28 U.S.C. § 2244), governs the Court's review in this case. *See Paxton v. Ward,* 199 F.3d 1197, 1204 (10th Cir.1999) (AEDPA applies to habeas petitions filed after April 24, 1996, regardless of date of criminal trial forming basis of conviction). Under Section 2254, as amended by the AEDPA, the Court may not issue a writ of habeas corpus with respect to any claim which the state court adjudicated on the merits unless that adjudication resulted in a decision:

> (1) ... that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) ... that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. 2254(d)(1)-(2). Under the "contrary to" clause, the Court may issue a writ of habeas corpus only if (1) the state court arrived at a conclusion opposite to that reached by the United States Supreme Court on a question of law, or (2) the state court decided the case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under the "unreasonable application" clause, the Court may grant habeas relief if the state court "correctly identifie[d] the governing legal rule but applie[d] it unreasonably to the facts of a prisoner's case." *Id.* at 407–08, 120 S.Ct. 1495. The Court may not issue a writ simply because it concludes, in its independent judgment, that the state court applied clearly established federal law erroneously or incorrectly; rather the application must be objectively unreasonable. *Id.* at 409–11, 120 S.Ct. 1495.

A claim of ineffective assistance of counsel, in violation of the Sixth Amendment, is governed by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Williams,* 529 U.S. at 390–91, 120 S.Ct. 1495 (*Strickland* qualifies as clearly established federal law under AEDPA even though test, by necessity, requires case-by-case examination of evidence); *see also Upchurch v. Bruce,* 333 F.3d 1158, 1162–1164 (10th Cir.2003). To show ineffective assistance of counsel under *Strickland,* Scott must satisfy two prongs:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. To establish the first element—deficient performance—Scott must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. 2052. To establish the second element—prejudice—Scott must show a reasonable probability that but for the errors of counsel, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient

to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

 Appellate counsel need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). Although it is possible to bring a *Strickland* claim based on the failure of appellate counsel to raise a particular issue, "it is difficult to demonstrate that counsel was incompetent." *Id.* To evaluate the performance of appellate counsel, the Court looks to the merits of the omitted issue. *See Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir.2003). "If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance." *Id.* On the other hand, if the omitted issue "has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance." *Id.*

## IV. Analysis

Scott asserts that he was denied effective assistance of counsel at trial and on appeal, in violation of the Sixth and Fourteenth Amendments of the United States Constitution. Specifically, Scott contends that trial counsel failed to object to (1) improper arguments by the prosecutor during closing argument and (2) the trial

judge's *ex parte* communication with Junior and endearing remarks to him. Scott further contends that appellate counsel failed to properly raise these issues on appeal. Finally, Scott maintains that the cumulative errors of trial and appellate counsel require this Court to vacate his conviction.

### A. Allegedly Improper Statements By Prosecutor

Scott maintains that counsel erred at trial, and on appeal, by not objecting to and/or raising the issue of improper statements by the prosecutor. Scott asserts that during closing argument, the prosecutor (1) improperly argued that J.P. suffered psychological trauma which affected his memory, when no such evidence was presented at trial; and (2) improperly remarked on the credibility of witnesses and Scott's own credibility. Scott's trial counsel objected to some but not all of the challenged remarks. Appellate counsel did not raise the issue of prosecutorial misconduct.

In ruling on Scott's habeas claim, the Kansas Court of Appeals determined that Scott's trial and appellate counsel were not deficient under *Strickland.* *See Memorandum Opinion* dated February 8, 2002, at 5–7, Case No. 86,755. In doing so, the Kansas Court of Appeals decided that the prosecutor's statements did not constitute reversible error and that counsel did not err in failing to object at trial or raise the issue on appeal. *Id.* at 7. The Kansas Court of Appeals decided the merits of Scott's claim under the correct legal standard.[6] This Court must therefore deter-

---

**6.** Although the opinion by the Kansas Court of Appeals does not discuss all of the challenged prosecutorial remarks, it sets forth the correct legal standard and constitutes a decision "on the merits" for purposes of the AEDPA. *See Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir.1999) (an adjudication "on merits" exists in absence of evidence that state court did not consider and reach merits of petitioner's claims). Thus, the Court must defer to the state court result even if the state court did not expressly state the reasoning for its decision. *Id.; see also Hawkins v. Mullin*, 291 F.3d 658, 674 (10th Cir.2002).

mine whether its disposition was an unreasonable application of *Strickland.* *See Upchurch v. Bruce,* 333 F.3d 1158, 1164 (10th Cir.2003).

### 1. Argument That Psychological Trauma Affected J.P.'s Memory

█ Scott asserts that counsel should have objected and/or argued on appeal that the prosecutor engaged in misconduct, by arguing that psychological trauma had impaired J.P.'s memory. During closing argument, the prosecutor argued that the crimes had occurred more than a year before trial, and involved a lot of little details for an eleven or twelve year-old to remember. Tr. 242–43. In doing so, the prosecutor stated:

> If what [J.P.] has told you is true, and I think there is strong evidence for it, it must have been horrible.... It may have been scary and it must have been pretty lonely for him. I think there would be a good argument to make that being a child victim of a sexual crime has got to be one of the loneliest victims that there ever is. And I'm sure it doesn't make it any better if it comes from your uncle. If what [J.P.] has told you is true ... would you expect his story to be exactly the same each time, verbatim, word for word, every detail right to a T? ... If his details were exactly the same each time you would probably suspect—I think there would be good reason to suspect that there might be something like either coaching or perhaps that he was making it up or memorization.

Tr. 243–44. In addition, the prosecutor likened the changes in J.P.'s testimony to the memory of a Holocaust survivor:

> Sure there's [sic] changes in his stories. In a young boy you can understand why he might be scared, and why he may not have a picture perfect memory of every exact detail that went on that night. The survivor of the Holocaust doesn't re-member all the details detail for detail each time a year or two after it happened. It doesn't mean that the Holocaust didn't happen .....

Tr. 246. The prosecutor also argued that psychological trauma may have affected J.P.'s ability to remember details:

> The trauma that would have been experienced by [J.P.]. When would the trauma be the greatest? The trauma would be greater at trial, or would the trauma be greatest [a year earlier, closer] to the time when the events took place and when the questioning took place. If trauma had an impact on his ability to remember the details when would that trauma have had the biggest impact on the boy's ability to remember every last detail?

Tr. 279–280. At that point, defense counsel objected that the record contained no evidence that trauma had affected J.P.'s memory. Tr. 280. The trial judge overruled the objection, apparently adopting the prosecutor's argument that the jury could so conclude from their experience and common knowledge. *Id.* The prosecutor continued:

> You heard the testimony from the boy about what he went through and you can use your common experience to ask yourselves and to conclude and to exercise your judgment as to whether or not that trauma would have had—what type of impact it would have had on his interview and the testimony to Kelly Kemp as opposed to later on at the pretrial, at the preliminary hearing and at the trial. Ask yourselves and weigh the evidence and see if that would have had any impact.

Tr. 280.

The Kansas Court of Appeals found that at most, the prosecutor's arguments constituted harmless error and that defense counsel had not erred in failing to object

or raise the issue on appeal. In reaching its decision, it applied Kansas law on prosecutorial misconduct, which is based on standards similar to federal law. *Compare State v. Campbell,* 268 Kan. 529, 539, 997 P.2d 726, 734–35, *cert. denied,* 531 U.S. 832, 121 S.Ct. 86, 148 L.Ed.2d 47 (2000), *with Le v. Mullin,* 311 F.3d 1002, 1013 (10th Cir.2002). Because the Kansas Court of Appeals decided the merits of Scott's claim under the correct legal standard, this Court decides only whether its application of federal law was objectively unreasonable. *See Williams,* 529 U.S. 362 at 409–11, 120 S.Ct. 1495.

 Scott contends that the prosecutor's trauma theory prejudiced the jury and denied him a fair trial.[7] More specifically, Scott asserts that the arguments about psychological trauma fell outside the common experience of the jury and were therefore improper without evidentiary support. Generally, the Court will reverse a state conviction only if prosecutorial remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "Inquiry into fundamental fairness requires examination of the entire proceedings, including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase." *Le,* 311 F.3d at 1013. The Court may consider any cautionary steps—such as instructions to the jury—offered by the trial court to counteract improper remarks. *Id.* (citing *Darden v. Wainwright,* 477 U.S. 168, 182, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). Counsel's failure to object to the comments, while

not dispositive, is also relevant. *Id.* (citing *Trice v. Ward,* 196 F.3d 1151, 1167 (10th Cir.1999)). "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Id.* (quoting *Darden,* 477 U.S. at 181, 106 S.Ct. 2464). Ultimately, the Court considers the jury's ability to judge the evidence fairly in light of the prosecutor's conduct. *Id.* (citing *Tillman v. Cook,* 215 F.3d 1116, 1129 (10th Cir.2000)).

As noted, the Kansas Court of Appeals found that trial and appellate counsel had not erred in failing to object and/or raise the issue on appeal because the prosecutor's statements did not constitute reversible error. This determination was not unreasonable. The prosecutor merely suggested that the jury use its common experience to consider what impact (if any) the trauma might have had. Tr. 280. Moreover, any undue influence was presumably mitigated by the trial court's jury instruction that

> [s]tatements, arguments and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by the evidence they should be disregarded. It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified.

Tr. 233. On this record, the Court easily concludes that the decision of the Kansas Court of Appeals constitutes a reasonable application of clearly established federal law.

---

**7.** Scott seeks habeas relief based on ineffective assistance of counsel, not prosecutorial misconduct. Because Scott's ineffective assistance claim is based on prosecutorial misconduct, however, the Court must analyze whether the alleged conduct was improper and whether such conduct would warrant a new trial if Scott's counsel had objected and/or raised the issue on appeal.

### 2. Remarks On The Credibility Of Scott And Witnesses At Trial

■ Scott maintains that counsel erred by not objecting and/or attacking on appeal the prosecutor's statements regarding Scott's own credibility and the credibility of trial witnesses. Scott contends that the prosecutor improperly bolstered the credibility of the prosecution witnesses by commenting on their truthfulness, and undermined Scott's credibility by calling him a liar. With respect to Junior's testimony, the prosecutor commented:

> What a kid. Talk about rock solid testimony. That kid never wavered in his testimony. . . . You can decide for yourself if you think Junior would make anything up for anybody for any reason in front of a judge and a jury whatsoever. You saw the way that young boy behaved on the stand. . . . . I ask you to judge for yourself if you think his nervousness—if you think Junior's nervousness on the witness stand was because he was making up a story, or was it because the truth was so great, was so much for him, it was so difficult for him to get that truth out of his mouth? It's for you to judge. Junior was as solid as a rock. It was almost too much for him to tell it because it embarrassed him. But he told the truth and it wasn't easy.

Tr. 247–48. The prosecutor also talked about Anita's testimony, stating: "She doesn't seem to me to be the type that would cook up any story or coach her kids." Tr. 248 ll.21–22. At this point defense counsel objected and outside the hearing of the jury, the trial judge cautioned the prosecutor not to express his personal opinion. The trial judge then admonished the jury:

> Members of the jury, I want to admonish you that Mr. Martin's opinion is not

what matters in this case. Your opinion is what matters in this case.

Tr. 249 ll.11–12.

The prosecutor also argued that some of the parts of J.P.'s story were too true to be made up:

> It's too true to be made up. Ask yourself whether or not a kid of 11 or 12 years old—ask yourself if an 11 or 12 year old kid could make up having liquid soap being used as a lubricant for anal sodomy. . . . You, the jury, can conclude that is simply too true to be anything other than true. The blood in the stool. . . . [W]hat kind of kid would make that up?

Tr. 253. As to Scott, the prosecutor asserted that he had lied in his interview with Kemp:

> . . . Officer Kelly Kemp said "tell me about the night of the storm." The defendant immediately went to the events associated with the attempted sodomy on the first night and was significantly enough aware of those to be aware of that first night of the crime without having been told anything. Simply tell me about the night of the storm. Now that in and of itself isn't as critical as the next part of that give and take. The next part of that give and take by Officer Kemp was "how did you know what night I was talking about?" Robert Scott said, "Well, Tom Bartlett told me." Conclude from the evidence in front of you that was a flat bald faced lie because Tom Bartlett testified honest and he did not give any of those facts or evidence that would connect that up for the defendant. It was a lie in the face of the investigation. How could he have known it? How would he have known that about connecting that up? Tom Bartlett didn't tell him. Kelly Kemp didn't tell him. He knew it and in the

face of it he tries to get out of it by saying "Tom Bartlett told me."

Tr. 254.

■ Under both Kansas and federal law, it is improper for a prosecutor to assert his or her own opinion regarding the credibility of a witness. *See State v. Pabst,* 268 Kan. 501, 506–07, 996 P.2d 321, 326 (2000); *Hopkinson v. Shillinger,* 866 F.2d 1185, 1209–10 (10th Cir.1989), *overruled on other grounds, Sawyer v. Smith,* 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990). The Tenth Circuit has nevertheless cautioned that a criminal conviction should not be lightly overturned on the sole basis of prosecutor statements. *Hopkinson,* 866 F.2d at 1210. The Court must view the statements in context to determine whether they affected the fairness of the trial. *Id.* To do so, the Court looks to the strength of the evidence against the defendant and decides whether the prosecutor's statements plausibly "could have tipped the scales in favor of the prosecution." *Id.* (quotation and citation omitted). The Court also considers whether curative instructions might have mitigated the effect of improper statements on the jury. *Id.* Ultimately, the Court considers the probable effect of the prosecutor's statements on the jury's ability to judge the evidence fairly. *Id.*

The Kansas Court of Appeals concluded that counsel's performance was not deficient because at most, the challenged prosecutorial remarks constituted harmless error which had little (if any) likelihood of changing the result the trial. *Memorandum Opinion* at 5 in Case No. 86,755. The Court agrees. Even if the remarks were improper, they did not render Scott's trial fundamentally unfair. *See, e.g., Duckett v. Mullin,* 306 F.3d 982, 990–91 (10th Cir.2002). Indeed, the jury verdict reflects that the jury exercised discerning judgment by acquitting Scott of the most serious crimes and convicting him only on the lesser offense of aggravated indecent liberties with a child—which the evidence at trial well supported. The decision of the Kansas Court of Appeals was not an unreasonable application of clearly established federal law.

## B. Trial Judge's *Ex Parte* Conference And Endearing Remarks To Junior

■ Scott maintains that counsel erred in not objecting to and/or challenging on appeal (1) an *ex parte* conference between the trial judge and Junior and (2) endearing remarks which the judge made to Junior in front of the jury. Respondents contend that Scott has not exhausted state court remedies on these claims because he did not raise either argument in his habeas brief to the Kansas Court of Appeals. Under Section 2254, the Court cannot grant a writ of habeas corpus unless Scott has exhausted state court remedies.

In his petition for habeas relief in the Kansas district court, Scott raised essentially the same arguments that he makes to this Court. *See Memorandum Of Law In Support Of Petition For Relief Under K.S.A. 60–1507* filed December 7, 2000 in Case No. 00C48. On his appeal of the state habeas decision, however, Scott argued only that the state district court had erred in (1) not appointing counsel and (2) not holding an evidentiary hearing in his habeas proceeding. In other words, Scott's brief did not argue the merits of his habeas claim, *i.e.* that his trial and appellate counsel were ineffective. *See Appellant's Brief* filed September 4, 2001 in Case No. 86,755. The Kansas Court of Appeals nonetheless decided the case as if the merits were before it. More specifically, it found that (1) Scott's counsel were not deficient in failing to object to and/or raise on appeal the issue of prosecutorial misconduct; and (2) Kansas Supreme

Court Rule 183(c) barred Scott's claim of ineffective assistance with respect to the *ex parte* conference and the endearing remarks. *See Memorandum Opinion* in Case No. 86,755. It is unclear why the Kansas Court of Appeals decided the case as if the merits were before it—when Scott's appellate brief did not argue them—but the fact that it did so precludes respondents' argument that Scott did not exhaust state court remedies. Because the Kansas Court of Appeals did not address the merits of the ineffective assistance claim regarding the *ex parte* conference and endearing remarks, however, the Court makes its own determination on the claims.[8] *See LaFevers v. Gibson,* 182 F.3d 705, 711 (10th Cir.1999).

 Early in his testimony, Junior became scared and nervous and did not want to answer the questions by the prosecutor. At that time, the trial judge told Junior, who was six years old: "Honey, you need to move your hands away from your mouth so they can hear you. Okay?" Tr. 120 ll.5–6. The prosecutor suggested that Junior first tell the judge, then tell the jury, what he saw. Defense counsel agreed. In that regard, the record reflects the following exchange:

> MR. MARTIN [prosecutor]: Your Honor, I would ask that—could we give him an opportunity to tell you and then have him tell the jury after he tells you?
>
> THE COURT: Any objections to that, Miss Segarra?
>
> MS. SEGARRA [defense counsel]: No. That's fine.
>
> THE COURT: You want to whisper in my ear?

MR. MARTIN: If you're embarrassed would you be able to tell the judge what you saw? Tell the judge what you saw. Tr. 120.

Junior tried to whisper to the judge, but the judge could not hear. The judge said: "I can't hear you son. Let's go back in here." Tr. 121 ll.1–2. The judge then took Junior into chambers.[9] Tr. 120–21. When they returned to the courtroom, the judge said the following to counsel outside the hearing of the jury:

> This is an unusual situation I've never encountered before and I don't know whether I just committed reversible error by going into chambers, but I want the record to reflect that I went into chambers with this child and this—and asked him what happened and he told me that—I said "What did you see when you looked in the window?" And he says "Bobby having sex with [J.P.]." And I said "Were their clothes on or off?" And he said "They were off." And I said "Can you go out and say that to the jury if that's the question that's put to you?" And he says "Yes." I said "Are you embarrassed?" And he said "Yes." I said "Well, let's go back outside." That's the entirety of what went on and I wanted the record to reflect what occurred. Now you may restate your question, Mr. Martin, and ask him what he saw when he looked in the window.

Tr. 121.

After meeting with the judge, Junior testified that he looked through the window of his parents' bedroom and saw Scott having sex with J.P. At the end of Junior's

---

8. Although the Kansas Court of Appeals held that Kansas Supreme Court Rule 183(c) barred Scott's habeas claim of ineffective counsel regarding the *ex parte* conference and endearing remarks to Junior, respondents do not make such argument in this Court and the Court need not address it.

9. The record does not reflect the amount of time that the judge and Junior spent in chambers.

testimony, the judge told Junior that he could go and find his parents and said that it was "[n]ice to meet you." Tr. 135 ll.6–9. The trial judge did not excuse any other witness with these words.

Scott argues that his trial counsel should have objected to the *ex parte* conference and endearing remarks by the judge. Scott has not shown, however, that trial counsel's failure to object falls below an objective standard of reasonableness, or that he was prejudiced as a result thereof. *See Strickland,* 466 U.S. at 687–94, 104 S.Ct. 2052. With respect to the judge's comments, such remarks typically occur in conversations with young children and it was reasonable for Scott's counsel to not object. As to the *ex parte* communication between the trial judge and Junior, such conduct is not per se unconstitutional. *See LaChappelle v. Moran,* 699 F.2d 560, 566 (1st Cir.1983). The issue is whether the judge's actions were so egregious and fundamentally unfair as to deprive defendant of his constitutional rights. *See id.* In making this determination, the Court looks to the reasons for conducting the *ex parte* conference and the impact that the conference might have had on defendant's right to a fair trial. *See id.*

As noted, Junior was six years old at the time of trial. Tr. 115. As the trial judge recognized in retrospect, an *ex parte* conference in chambers may not have been the best way to handle Junior's fright and nervousness. This Court does not doubt the judge's integrity or good faith, however, or have any reason to question whether he gave counsel a complete and accurate recounting of his conversation with Junior in chambers. In agreeing to let Junior talk to the judge before he talked to the jury, defense counsel could easily have made the strategic decision to appear agreeable and sympathetic in dealing with Junior—a decision that would have been entirely reasonable in the circumstances.

Defense counsel did not expressly agree to let the judge take Junior into chambers, but she presumably could have requested an opportunity to object to such conduct outside the hearing of the jury. Even if her failure to do so was objectively unreasonable, however, Scott has not shown that it prejudiced his right to a fair trial. To show prejudice, Scott must show a reasonable probability that the result of the proceeding would have been different but for counsel's error. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The record reflects that the sole purpose of the *ex parte* communication was to calm Junior, a six-year old witness who was nervous and scared. Scott provides no evidence that the judge improperly influenced Junior's testimony or that his actions unduly influenced the jury. In other words, nothing in the record indicates that the result would have changed had trial counsel objected to the judge's conduct. Therefore Scott has not shown that trial counsel was ineffective in failing to object.

With respect to ineffective assistance on appeal, Scott asserts that counsel incorrectly couched the issue as whether the judge had engaged in witness coaching, when he should have argued that the judge's conduct prejudiced the jury. A review of Scott's brief on direct appeal, however, indicates that appellate counsel argued the very points which Scott asserts that he omitted. *See Brief of Appellant* at 9, 13 in Case No. 82,119 (arguing that *ex parte* communications and endearing remarks to Junior created appearance of partiality). Scott has not shown that appellate counsel was ineffective.

### C. Cumulative Error

Scott asserts that the cumulative errors of trial and appellate counsel require reversal. Because Scott has not shown that counsel's performance was deficient or

prejudicial, he has not shown any errors to cumulate. *See United States v. Rivera,* 900 F.2d 1462, 1474 (10th Cir.1990). Scott is not entitled to reversal of his conviction.[10]

**IT IS THEREFORE ORDERED** that the petition for habeas corpus pursuant to 28 U.S.C. § 2254 be and hereby is **DENIED.**

---

**10.** As noted, Scott's claim for habeas corpus relief is based solely on ineffective assistance of trial and appellate counsel. He does not assert that he is entitled to relief based on prosecutorial misconduct or judicial misconduct. The Court would reach the same result, however, if Scott had raised substantive claims of prosecutorial and judicial misconduct.